Lawrence D. SMITH, Plaintiff,

v.

**ROCHESTER TELEPHONE BUSINESS MARKETING CORP., et al.,**
**Defendants.**

Civ. No. 90–81L.

United States District Court,
W.D. New York.

Feb. 13, 1992.

James C. Holahan, Harris, Beach & Wilcox, Rochester, N.Y., for plaintiff.

David M. Lascell, William D. Eggers, Nixon, Hargrave, Devans & Doyle, Rochester, N.Y., for defendants.

LARIMER, District Judge.

## BACKGROUND

This is an action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiff, Lawrence D. Smith ("Smith"), seeks to recover damages based on his claims that he has been denied benefits to which he is entitled under certain employee benefit plans.

The complaint names thirteen defendants. Two defendants, Rochester Telephone Business Marketing Corporation ("RTBMC") and Rotelcom, Inc. ("Rotelcom"), are former employers of Smith. RTBMC is allegedly an "umbrella" sales and marketing company for several subsidiaries of Rochester Telephone Corporation ("RTC"), including Rotelcom. For purposes of this action, RTBMC and Rotelcom are allegedly one and the same.

Also named as defendants are three employee benefit plans of which Smith is a participant and beneficiary. Those plans are: the RTC Pre–Pension Leave Plan ("Pre–Pension Leave Plan"); the RTC Management Pension Plan ("Pension Plan"); and the RTC Management Investment and Savings Plan and Management Optional Salary Treatment Plan ("MISP/MOST Plan").

The remaining eight defendants are individual persons. Defendant Richard E. Sayers was the President of RTBMC until June 1990. Robert M. Curran is Director of Personnel and Staff for RTC and Chairperson of the RTC Employees' Benefits Committee ("EBC"), which is the named fiduciary and plan administrator for the three plans. The other individual defendants are alleged to be or have been members of the EBC.

Smith alleges that on January 4, 1989, he informed RTBMC that he intended to retire on January 13, 1989. Smith at that time was employed as a management level employee selling telecommunications equipment and services in Upstate New York.

Although Smith was only fifty years old, he had over thirty years of service, which, he alleges, made him eligible for full early retirement benefits under the Pension Plan. Smith also claims that he was entitled to a four-month leave of absence at full pay under the Pre–Pension Leave Plan. In addition, Smith was a participant in the MISP/MOST Plan. This is an investment and savings plan in which individual employees have accounts that are funded by a combination of employee and employer contributions.

When informed that Smith was retiring, RTBMC calculated that his remaining accrued vacation time would run from January 14 through March 31, 1989, and that he would receive what was referred to as a "pre-pension leave of absence" from April 1 through July 31. Smith would then begin receiving pension benefits on August 1, 1989. On January 13, 1989, Smith ceased working for RTBMC and he began receiving his vacation pay.

Prior to leaving RTBMC, however, Smith had already secured a position with ACC Long Distance Corporation ("ACC"), a competitor of RTBMC. Smith and ACC had entered into a written employment agreement on January 4, 1989, which called for Smith to begin working for ACC on January 16, 1989. (Def.Ex. G).

On February 17, 1989, when RTBMC found out that Smith was working for ACC, defendant Sayers sent him a letter advising him that because Smith was then using vacation and pre-pension leave time, he was still considered an "employee" of RTBMC. Sayers warned Smith that "while you remain our employee, you owe us a duty of loyalty," and that unless within one week Smith sent RTBMC a written certification that he had ceased working for ACC and was not in competition with RTBMC, Smith's pre-pension and unearned 1989 vacation benefits would be deemed forfeited. (Def.Ex. K).

Smith did not stop working for ACC. On March 10, 1989, Sayers sent him another letter stating that as of March 2, RTBMC considered Smith to have forfeited his right to further employee benefits, including his pre-pension leave and vacation time. This letter was followed up by another on

March 22 which confirmed that Smith was not eligible to receive any unaccrued benefits due to his alleged violation of his duty of loyalty to RTBMC.

Smith appealed this decision to the EBC. In a letter dated May 18, 1989, the EBC informed Smith that it had denied his appeal, and that his pension benefits had been recalculated based on a March 3, 1989 retirement date. The resulting benefits, about $2400 per month, were, according to defendants, about $43 per month less than Smith would have received had the benefits been based on the original August 1 date.[1] Smith began receiving pension benefits in that amount in March 1989.

The instant action was commenced on January 22, 1990. Smith filed an amended complaint on June 25, 1991. The first two causes of action in the amended complaint are for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). In the first cause of action, Smith claims that he is entitled to $5581 per month under the Management Pension Plan instead of the $2400 per month that he is now receiving. The second claim is for four months' worth of pay under the Pre–Pension Leave Plan.

In the third cause of action, Smith alleges that his purported termination as of March 2, 1989 constitutes discrimination motivated by an intent to interfere with his benefit rights in violation of 29 U.S.C. § 1140. The fourth cause of action is asserted against the seven individual members of the EBC for breach of fiduciary duty in their administration of the three plans, in violation of 29 U.S.C. § 1104.

The fifth claim is against Rotelcom and RTBMC for breach of their contractual obligations to Smith in connection with his benefits. The sixth cause of action alleges that Rotelcom promised its salespersons, including Smith, that their benefits would be calculated according to a certain formula (which will be explained in detail below), but that Rotelcom either failed to apply this formula to certain benefits or failed

properly to calculate Smith's benefits under the formula.

Plaintiff seeks damages based on each of these causes of action in amounts ranging from $16,000 to $433,300.

## DISCUSSION

### 1. Claim for Benefits Under the Management Pension Plan

Defendants argue that the first cause of action, for lost pension benefits, is without merit because the EBC acted within its discretion in calculating Smith's benefits. Defendants rely on a statement in § 10.3 of the Management Pension Plan that "The [Employees' Benefits] Committee shall interpret the Plan and shall determine all questions arising in the administration, interpretation, and application of the Plan. Any such determination by the Committee shall be conclusive and binding on all persons."

The dispute concerning these benefits involves two issues. One is the date which was used to calculate Smith's benefits. Defendants based Smith's pension benefits on the March 2, 1989 termination date. Smith contends that his benefits should have been calculated according to the date when he was originally supposed to begin receiving them, i.e., August 1, 1989. Smith claims that March 2 is not the proper date because he was wrongfully terminated. If the August 1 date had been used, Smith's benefits would be slightly higher—about forty dollars per month, according to defendants.

The second issue, which accounts for most of the difference between the parties' calculations of the pension benefits, concerns Smith's sales commissions. The Pension Plan's formula for calculating benefits is based on a combination of the participant's years of service and his average "compensation preceding retirement." Pension Plan § 4.1. "Compensation" is defined in § 2.11 as "the total of an Employee's base rate of pay and bonuses for per-

---

**1.** Smith does not contest this assertion as such, but claims that the calculation of his benefits was wrong in other ways as well, and that he is entitled to $5581 per month. The discrepancies between the parties' calculations will be discussed in detail below.

sonal services actually rendered by the Employee to the Employer.... Compensation does not include ... any types of extra remuneration (except bonuses) of whatever nature."

Smith contends that his sales commissions should have been included as part of his compensation. Smith argues that commissions are either included within "base rate of pay" or "bonuses."

Defendants argue that even if commissions *could* be considered part of an employee's compensation under § 2.11, the EBC had discretion to determine that they are not.

■ Before reaching the merits of this claim, the court must determine the appropriate standard of review. In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956. If the administrator has discretionary authority, the court must apply the more deferential arbitrary-and-capricious standard. *Id.*

One indication of the presence or absence of discretionary authority is whether the plan uses categorical or conditional language. In *Heidgerd v. Olin Corp.*, 906 F.2d 903, 908 (2d Cir.1990), for example, the court held that a statement in a plan that began, "Benefits *are* payable if ..." did not give the administrators discretion, but another statement that "In some unusual cases, benefits *may* be payable ..." did grant discretion to interpret the plan.

In the case at bar, the Management Pension Plan states that a retiree's benefit rate "shall be the sum of" certain figures, among which is "the average of his last five years of Compensation preceding retirement ..." Thus, the EBC has no discretion to decide whether to include compensation.

■ The important question here, though, is whether the EBC has discretion to determine what *constitutes* compensation. As stated, compensation is defined as "the total of an Employee's base rate of pay and bonuses," excluding "extra remuneration (except bonuses) of whatever nature." Nowhere does the plan define "base rate of pay," "bonuses," or "extra remuneration."

The plan provides that the EBC "shall *interpret the Plan* and shall *determine all questions arising in its interpretation,* and application of the Plan. Any such determination by the Committee shall be conclusive and binding on all persons." Pension Plan § 10.3 (emphasis added). I believe that this language indicates that the EBC was intended to have discretion to decide the meaning of words and phrases not explicitly defined in the plan itself. *See Fuller v. CBT Corp.*, 905 F.2d 1055, 1058 (7th Cir.1990) (grant of power "to construe and interpret" plan requires deferential review); *De Nobel v. Vitro Corp.*, 885 F.2d 1180 (4th Cir.1989) (power to "[d]etermine all benefits and resolve all questions pertaining to the administration, interpretation and application of Plan provisions ..." bars *de novo* review); *Lowry v. Bankers Life & Casualty Retirement Plan*, 871 F.2d 522 (5th Cir.1989) (authority to "interpret and construe" plan and to "determine all questions arising" in plan administration bars *de novo* review).

I find, therefore, that the EBC's determination that sales commissions are not included in calculating pension benefits must be reviewed under the arbitrary-and-capricious standard. I also find that there are no genuine issues of material fact that would preclude summary judgment on this cause of action. The relevant documents are in the record, and there is no real dispute about the facts. The only issue is whether the EBC's interpretation of the plan should be upheld.

■ After reviewing the record, I find that the EBC's decision that commissions constitute "extra remuneration" that is not part of the employee's compensation under § 2.11 is neither arbitrary nor capricious.

To the extent, therefore, that the first cause of action seeks to have Smith's benefits recalculated by including his commissions, I grant summary judgment in favor of defendants.

"A trustee may be given power to construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable." *Firestone,* 489 U.S. at 111, 109 S.Ct. at 954. The EBC's determination that commissions are not part of one's base rate of pay is reasonable. Since commissions depend on sales, they constitute an addition to the employee's base rate of pay.

I am also not convinced that the EBC erred in deciding that commissions are not bonuses. There was a bonus system for sales managers whose departments met or exceeded certain goals, and payments under this program were expressly called "bonuses." *See* Pltf.Ex. Q. The plans that applied to Smith, on the other hand, referred to "commissions." Smith argues that the managers' bonuses were effectively the same as sales commissions, because they were extra payments for reaching certain sales levels. Even if there were analogies between managers' bonuses and salespersons' commissions, however, they were two separate programs, and defendants were not obligated to treat them identically for purposes of calculating pension benefits. The fact that defendants used two different names—commissions and bonuses—is an indication that commissions were not intended to be included as part of an employee's compensation under the pension plan.

Furthermore, the plan excludes "extra remuneration" other than bonuses. In effect, this set up a broad category of *any* payments outside the employee's base salary, and then carved out a specific exception for bonuses. It was not unreasonable for the EBC to conclude that commissions did not fall within this exception.

Finally, the EBC's denial of Smith's appeal states that the exclusion of commissions represented a long-standing interpretation of the plan, and there is no evidence to the contrary. *See* Ruth Accorso Affidavit ¶ 7. That assertion is also supported by papers that Smith received when he was transferred to Buffalo in 1982 which discuss the calculation of bonuses *and* commissions separately. *See* Pltf.Ex. O. The consistency of prior interpretations of a plan provision is a factor that the court may consider in determining whether a given interpretation is arbitrary or capricious. *See, e.g., Donovan v. Carlough,* 576 F.Supp. 245, 249 (D.D.C.1983), *aff'd,* 753 F.2d 166 (D.C.Cir.1985).

There remains the issue of the date of calculation of plaintiff's pension benefits. Whether Smith should have begun receiving those benefits on August 1 or sooner depends on whether he was entitled to use up his remaining vacation and pre-pension leave. As explained below in the discussion of the second cause of action, I find that Smith was entitled to the benefit of all of his pre-pension leave. Therefore, his pension benefits should not have started until his pre-pension leave was completed.

I do not believe, however, that Smith was entitled to use up the remainder of his vacation. This was simply an ordinary employee benefit which was not covered by ERISA.[2] The fact that Smith deferred some vacation until retirement did not affect its character as a part of his normal compensation or transform it into a pension or welfare benefit. *Massachusetts v. Morash,* 490 U.S. 107, 112, 109 S.Ct. 1668, 1671, 104 L.Ed.2d 98 (1989). Unlike pre-pension leave, vacation was available to all employees and was "not contingent upon the termination of their employment." *Id.*

Smith's vacation pay, then, could be treated by defendants in the same manner as if he had taken a vacation prior to his announced retirement. Had Smith gone to

---

**2.** Title 29 C.F.R. § 2510.3-1 lists certain "payroll practices," which are not covered by ERISA. These include "Payment of compensation ... on account of periods of time during which the employee, although physically and mentally able to perform his or her duties ... performs no duties ..." Vacation is expressly given as one example of a payroll practice.

work for ACC while on vacation at any time earlier in his career, he could certainly have lost his rights to continued employee benefits (other than non-forfeitable ERISA benefits) for breach of his implied duty of loyalty to his employer. *See Western Elec. Co. v. Brenner,* 41 N.Y.2d 291, 295, 392 N.Y.S.2d 409, 360 N.E.2d 1091 (1977); *National Bank of Pakistan v. Basham,* 148 A.D.2d 399, 539 N.Y.S.2d 347 (1989).

Smith was therefore not entitled to use up the remainder of his vacation at the time of his termination, but he was entitled to use up his pre-pension leave of absence before his pension benefits commenced. The record reflects that defendants considered March 2, 1989 to have been the effective date of Smith's termination, since by that time he had not responded to RTBMC's demand that he cease working for ACC. Had Smith been given his full four-month pre-pension leave of absence, he would have begun receiving pension benefits commencing July 2, 1989. This would apparently have some effect, albeit a relatively small one, on the amount of his monthly benefit. Since it is not evident from the record precisely what that effect would have been, however, the parties are directed to submit proof on this issue, if the matter cannot be resolved by stipulation, within twenty (20) days of the date of entry of this order.

For these reasons, defendants' motion for summary judgment on the first cause of action is granted, except to the extent that Smith seeks to have his pension benefits recalculated based on a different commencement date. As to that issue, plaintiff is granted summary judgment,[3] consisted with this decision.

## 2. Claim for Pre–Pension Leave Benefits

■ In his second claim, Smith contends that he is entitled under the Pre–Pension Leave Plan to four months of paid leave. Smith argues that these benefits are non-forfeitable under ERISA and that defendants had no authority to terminate them.

Under ERISA, 29 U.S.C. § 1053, certain types of employee benefits are nonforfeitable. This provision expressly applies to any "pension plan," which is defined in § 1002(2)(A) as

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

The nonforfeitability provision, however, does not apply to "employee welfare benefit plans." The definition of a welfare plan in 29 U.S.C. § 1002(1) covers a wide variety of plans, but excludes plans to provide "pensions on retirement."

Regulations enacted by the Secretary of Labor have further refined and delineated these categories. Title 29 C.F.R. § 2510.3–1 provides that welfare plans do not include "payroll practices," which include "Payment of compensation ... on account of periods of time during which the employee, although physically and mentally able to perform his or her duties ... performs no duties ..." Examples listed in the regulation include payment while an employee is on vacation, on military duty, serving as a juror, engaged in training, or on sabbatical leave. Payroll practices are outside the reach of ERISA altogether.

Defendants contend that the Pre–Pension Leave Plan merely creates a payroll practice providing for leaves of absence. Therefore, defendants argue, pre-pension leave is not covered by ERISA, but is instead subject to the common-law duty of loyalty to one's employer.

---

**3.** As explained in Part 2 of this opinion, the fact that plaintiff is the non-moving party is not a

bar to granting him summary judgment provided that the undisputed facts warrant it.

I am not persuaded by defendants' argument. Pre-pension leave, unlike an ordinary leave of absence, is *only* available to retiring employees. The summary plan description provided to employees expressly refers to pre-pension leave as a "benefit during retirement." *See* Pltf.Ex. D. In fact, the plan document itself makes extensive reference to participants' rights under ERISA, stating that "As a participant in the Plan you are entitled to certain rights and protections under ERISA." It then goes on to describe those rights, including the right "to file suit in a state or federal court" if a claim for benefits is denied.

Defendants assert that these statements were inserted "out of an abundance of caution" prior to the Supreme Court's decision in *Morash*, 490 U.S. 107, 109 S.Ct. 1668, which, defendants argue, made clear that pre-pension leave was outside the scope of ERISA. *Morash* held that a policy of paying a discharged employee for unused vacation time was governed by state law rather than ERISA. The Court in *Morash*, however, noted that "[u]nlike normal severance pay," which *is* covered by ERISA, "the employees' right to compensation for accrued vacation time is not contingent upon the termination of their employment." *Id.* 109 S.Ct. at 1675.

Vacation pay is qualitatively different from the pre-pension leave at issue here for the exact same reason: it is not contingent upon retirement. Moreover, vacation pay, unlike pre-pension leave, is explicitly excluded from ERISA by 29 C.F.R. § 2510.3-1.

The specific payroll practices listed in 29 C.F.R. § 2510.3-1 may well be illustrative rather than exhaustive. It is noteworthy, however, that all of the examples given share one thing in common: each of them describes a situation in which an employee is away from work due to some *temporary* circumstance and will presumably return to work when that circumstance ends. In contrast, the pre-pension leave in the case at bar is specifically limited to retiring employees. An employee on pre-pension leave is not expected to return to active employment. If he does, the plan—which describes such an event as a "rehire"—states that "All pre-pension leave payments shall cease," and that the employee "shall again be eligible for pre-pension leave" upon his subsequent "retirement."

Defendants argue that even if the Pre-Pension Leave Plan is covered by ERISA, it is merely an employee welfare benefit plan, the benefits of which are forfeitable. Defendants contend that Smith forfeited his pre-pension leave by working for a competitor before his effective retirement date.

Section 1002(2)(A) of Title 29 defines a pension plan as a plan which either "provides retirement income to employees" or "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond ...." The Pre–Pension Leave Plan does not result in any deferral of the employee's income. I believe, however, that it does provide retirement income, and that it is therefore a pension plan that is covered by § 1053, and not a welfare benefit plan.

For one thing, benefits under the plan are expressly conditioned upon retirement. The plan does state that "A person on pre-pension leave shall be deemed to have terminated employment with a Participating Company on the last day of his pre-pension leave." However, the nominal dividing line between employed and retired status is less significant than the fact that the plan is clearly designed for retiring employees. The plan's stated purpose is "to ease the transition of eligible employees from active employment to retirement by maintaining an employee's income level for a period of time while he adjusts to a non-working status." (Pltf.Ex. D).

Whether benefits are explicitly tied to retirement is a significant indication of whether a plan is a pension plan for ERISA purposes. In *Fraver v. North Carolina Farm Bureau Mut. Ins. Co.*, 801 F.2d 675 (4th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987), for example, the court held that an employment contract providing for certain termination benefits was *not* a pension plan, because "the benefits were not limited to termination for death, disability, or retire-

ment," but "were to be made regardless of the reason for termination ..." *Id.* at 678. *See also* 29 C.F.R. § 2510.3–2 ("severance pay plan" does not qualify as a pension plan if, *inter alia,* severance payments are not contingent upon employee's retirement).

The court in *Baumgardner v. Inco Alloys Int'l, Inc.,* 746 F.Supp. 623 (S.D.W.Va. 1990), held that pre-pension benefits similar to those in the case at bar were retirement benefits. Interestingly, the plaintiffs in that case claimed that their preretirement leave was *not* a retirement benefit. While the plaintiffs were on preretirement leave, the employer introduced an enhanced voluntary retirement program. The plaintiffs sued, claiming that they remained active employees while on preretirement leave and therefore had a right under ERISA to re-enter the work force and take advantage of the new program. The court disagreed, stating that "[p]reretirement leave is actually equivalent to retirement benefits to which a retired employee is entitled." *Id.* at 626.

Moreover, the statutory framework indicates that this plan is a pension plan rather than a welfare plan. Section 1002(1) of Title 29 defines a "welfare plan" as a plan to provide for

> (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 302(c) of the Labor Management Relations Act, 1947 [29 U.S.C. § 186(c) ] (other than pensions on retirement or death, and insurance to provide such pensions).

The benefits described in 29 U.S.C. § 186(c) include payments held in trust to provide employees and their families with "medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance ..."

Clearly, of all the types of benefits listed in sections 1002(1) and 186(c), the category most applicable to the pre-pension benefits in the case at bar is that for pensions on retirement. The benefits were not for medical care, vacation, or any of the other non-retirement purposes listed in the statutes. I conclude, therefore, that the Pre–Pension Leave Plan is a pension plan for ERISA purposes, and that benefits under the plan are subject to the nonforfeitability provision of 29 U.S.C. § 1053.

■ Even if the plan were only a welfare plan, however, Smith would be entitled to benefits, since the plan itself contains no provision for the termination of benefits when the recipient works for another employer. It was Congress' intent that the plan documents themselves "exclusively govern an employer's obligations under ERISA plans." *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 492 (2d Cir. 1988). The plan here never stated that an employee would lose his benefit rights by taking other employment. Instead, it stated that any full-time employee with the requisite length of service "shall be entitled to pre-pension leave" upon retirement.

Defendants contend that pre-pension benefits are subject to a common-law duty of loyalty under state law. That is not the case. Although "ERISA regulates pension plans far more extensively than welfare plans," *id.* at 491, welfare plans are still governed by ERISA rather than by state law. As the Second Circuit noted in *Moore,* 29 U.S.C. § 1144(a) "expressly states that the provisions of the Act 'supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan....'" 856 F.2d at 492.

Having reached this determination, I find that there are no issues of fact as to this cause of action. I therefore find that summary judgment should be entered in plaintiff's favor.

■ It is well-established that "summary judgment may be rendered in favor of the opposing party even though he has made

no formal cross-motion under Rule 56." 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 2720, pp. 29–30 (2d ed. 1983). If the court, after searching the record, finds undisputed facts which indicate that judgment against the moving party is appropriate, Rule 56(c) will operate to grant summary judgment in favor of the non-moving party. *See Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir.1983). "The making of a motion for summary judgment exposes the moving party to the risk that summary judgment will be granted against him, if the submissions make clear that there is 'no genuine issue as to any material fact ...'" *Siderius, Inc. v. M.V. "Ida Prima"*, 613 F.Supp. 916, 923 (S.D.N.Y.1985).

On this cause of action, it is clear from the record that the single dispositive issue is a legal one: was Smith's pre-pension leave a nonforfeitable benefit?[4] Since it is, there is no reason that Smith should not be granted summary judgment on this claim.

The only impediment to entering summary judgment at this time is that the amount of damages is not presently discernible from the record. Although various exhibits indicate the dates of the pre-pension leave of absence, as well as Smith's annual salary, it is not apparent what his net pay would have been during that time. Therefore, both sides are directed to submit proof on this issue unless the matter can be resolved by stipulation, within twenty (20) days of the date of entry of this order.

### 3. The "Discrimination" Claim

In his third cause of action, which is asserted against defendants RTBMC and Sayers, Smith alleges that his purported termination as of March 2, 1989 was motivated by an intent to interfere with his pension rights in violation of 29 U.S.C. § 1140. That statute makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ..."

Defendants contend that § 1140 does not apply when an employee's loss of benefits is due to his own disloyalty. Defendants argue that the third cause of action is therefore without merit, because defendants had a valid reason for firing Smith.

Smith claims that he was clearly terminated to interfere with his pension rights. Smith claims that Sayers explicitly used the threat of cutting off his benefits in an attempt to coerce Smith to leave ACC.

The order of proof on a claim under § 1140 follows that set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Plaintiff must first make a *prima facie* showing of discrimination by showing that: he belongs to the protected class; he was qualified for the position involved; and he was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent was present. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1115 (2d Cir.1988).

Once plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. If the employer meets this burden, plaintiff must then prove that the employer's stated reason is merely a pretext for discrimination. *Id.* at 1111.

I find that there are factual issues regarding this cause of action, and that summary judgment is therefore inappropriate. In his February 17, 1989 letter to Smith, Sayers expressly warned him that Smith's pre-pension benefits would be considered forfeited unless Smith quit working for ACC. There is some evidence, therefore,

---

4. Arguably, the issue would not be dispositive if the answer to that question were "no"; if the benefits could be forfeited for disloyalty, there might be a question of fact concerning whether Smith had been guilty of disloyalty. Since the benefits are non-forfeitable, however, that question is moot.

that defendants' decision to terminate Smith was motivated in part by concerns about his pre-pension benefits. Although one could argue the contrary—*i.e.*, that defendants' ultimate motive was not to cut off Smith's benefits, but to persuade Smith to end his employment with ACC—that is an issue of fact which cannot be resolved on this motion for summary judgment.

### 4. Breach of Fiduciary Duty

▮ In the fourth cause of action, Smith alleges that defendants Curran, Trubek, Zielinski, Hartrick, Neugebauer, Perperian, and Osterman ("the Committee members") breached the fiduciary duties imposed upon them by ERISA in reviewing and determining Smith's claims for benefits under the Pension, Pre-Pension Leave, and MISP/MOST Plans. Plaintiff contends that as a result of this breach of duty, he has suffered damages of at least $433,300.

In part, this cause of action is based on the Committee members' interpretation of the Pension Plan as excluding sales commissions from compensation. Since the court has found that that interpretation was not arbitrary or capricious, plaintiff's fourth cause of action must also fail.

For separate reasons, though, I find that the fourth cause of action is deficient and must be dismissed. ERISA sets forth certain duties on the part of plan fiduciaries. For example, the Act obligates every plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and ... for the exclusive purpose of ... providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i). A fiduciary is held to a "prudent man" standard of care. *Id.* § 1104(a)(1)(B).

Section 409(a) of ERISA makes fiduciaries liable for breach of any duty imposed by the Act. 29 U.S.C. § 1109(a). In addition, § 502(a)(2) provides a right of action to participants and beneficiaries for relief under § 409. 29 U.S.C. § 1132(a)(2).

In *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court held that plan fiduciaries may not be held personally liable to a plan participant for extra-contractual compensatory damages caused by improper processing of benefit claims. The Court therefore rejected a plaintiff's claim for damages against plan fiduciaries based in part on her allegation that they had applied improper standards for awarding benefits.

In its decision, the Court observed that "recovery for a violation of § 409 inures to the benefit of the plan as a whole." *Id.* at 140, 105 S.Ct. at 3089. The Court pointed out that under the language of § 409, "the potential personal liability of the fiduciary is 'to make good *to such plan* any losses *to the plan*'" rather than to individual participants. *Id.* (emphasis in original). The Court stated that "[a] fair contextual reading of the statute makes it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." *Id.* at 142, 105 S.Ct. at 3090.

In the case at bar, Smith's claim is that he was denied certain benefits to which he was entitled under the various plans. ERISA provides a remedy for that claim, but not pursuant to § 409. As the *Russell* Court noted, "[t]o recover the benefits due [plaintiff, he] could have filed an action pursuant to § 502(a)(1)(B) to recover accrued benefits...." which in fact Smith has done. *Id.* at 146–47, 105 S.Ct. at 3092. Since Smith is suing only for benefits for himself, and does not seek any relief authorized by § 409,[5] the fourth cause of action must be dismissed. *See Devine v. Combustion Engineering, Inc.,* 760 F.Supp. 989, 992 (D.Conn.1982) (plan participants could bring civil action against fiduciaries under 29 U.S.C. § 1132(a)(2) for breach of fiduciary duty, but could not recover dam-

---

5. As an example of relief which a participant may seek under § 409(a), the Court in *Russell* stated that if a plan administrator willfully refused to pay contractually-authorized benefits as part of a larger systematic breach of fiduciary obligations, a participant could ask for removal of the fiduciary. *Id.* 473 U.S. at 147, 105 S.Ct. at 3092.

ages as plan participants; all plaintiffs could do was sue on behalf of plan, and any losses to plan resulting from defendants' breach would be returned to plan itself).

### 5. Breach of Contract Claim

■ Plaintiff's fifth cause of action is a pendent state law claim for breach of his employment contract. Smith alleges that RTBMC and Rotelcom breached their contractual obligations to him by rescinding his pre-pension leave benefits and by miscalculating his pension benefits.

This claim relates solely to benefits which are governed by ERISA. This claim must fail. "Congress intended ERISA 'to occupy fully the field of employee benefit plans and to establish it "as exclusively a federal concern." '" *Moore,* 856 F.2d at 492 (quoting *Gilbert v. Burlington Indus. Inc.,* 765 F.2d 320, 326 (2d Cir.1985), *aff'd,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986)). Accordingly, ERISA preempts statutory and common law claims for benefits under plans within its scope. *Gilbert,* 765 F.2d at 326. Section 514(a) of ERISA, 29 U.S.C. § 1144(a), expressly states that the Act "supersede[s] any and all state laws" relating to employee benefit plans.

Since the subject matter of this cause of action falls within the purview of ERISA, then, it must be dismissed.

### 6. Calculation of MISP/MOST and Other Benefits

The sixth cause of action alleges that as early as 1982, Rotelcom promised its salespersons, including Smith, that their benefits would be based on a figure arrived at in part by multiplying their individual base salaries by 1.33. Smith contends that Rotelcom then failed to apply this formula to certain benefits, but that they did apply it to his pension benefits. He argues that defendants should either apply the 1.33 formula to all his benefits, retroactive to 1982, or that they should instead calculate his pension benefits on the basis of his base salary plus his commissions. In a sense, therefore, this claim is an alternative to the first cause of action, which seeks to have Smith's commissions included in the calculation of his pension benefits.

Defendants admit that they did use the 1.33 adjustment for certain benefits, but contend that there was never any promise or obligation to do so for the benefits in question here.

Before discussing the merits of this cause of action, the court must consider defendants' argument that it is time-barred. Defendants contend that Smith knew of the alleged breach as early as 1983, when defendants began calculating his benefits and contributions to the MISP/MOST plan according to the formula that Smith now challenges. Defendants argue that since Smith accepted his vacation pay and contributions without protest until February 1991, he is now barred from raising this claim.

An evaluation of defendants' argument requires an understanding of the background for use of the 1.33 factor. This formula was first announced to sales personnel in an August 2, 1982 commission plan issued by Rotelcom. Prior to that plan, sales employees had received a base salary and commissions, plus a draw against future commissions. The 1982 plan eliminated the separate draw and replaced it with the 1.33 adjustment in an effort to encourage more productive sales efforts. Doyle Affidavit, ¶ 10.

The effect of the 1.33 formula was explained in the 1982 plan, which stated that "the base for benefit compensation shall be 133% of base salary providing that the sum of base salary plus commissions awarded, in the prior year, meet or exceed that amount." As an example, the plan stated that if an employee's base salary were $30,000, he would have to have earned at least $10,000 in commissions, or $40,000 altogether, to obtain the maximum benefits, since 133% of $30,000 equals $40,000.

Under the heading, "Benefit Coverage," the plan listed the benefits that sales representatives would be provided, including the pension plan, investment savings plan, sick pay, vacations, and others. Def.Ex. X. The plan did not expressly state which benefits were covered by the new formula.

Smith alleges in the complaint that "beginning as early as 1983 and continuing to the present time, [Rotelcom] failed to compute vacation benefits, sick leave benefits, its contributions to the MISP/MOST plan, and other benefits for its sales persons using the 133% formula." It does not appear, however, that Smith formally raised this claim before the EBC until after this litigation began. In February 1991, Smith filed a claim asking that the 1.33 rule be applied retroactively to his vacation, holiday, and sick pay, and to his employee contributions to the MISP/MOST plan. Those claims were rejected by the responsible committees, and Smith then raised them in an amended complaint filed June 25, 1991.

The parties agree that the applicable statute of limitations is the six-year period for contract actions provided in C.P.L.R. 213. That is true both for the claims for vacation pay and other benefits which are covered by state law rather than ERISA, and for the claim relating to the MISP/MOST plan, which defendants concede is an employee benefit plan under ERISA. Although "ERISA does not prescribe a limitations period for actions under § 1132, the controlling limitations period is that specified in the most nearly analogous state limitations statute," which in this case is the six-year period of C.P.L.R. § 213. *See Miles v. New York State Teamsters Conference, Etc.*, 698 F.2d 593, 598 (2d Cir. 1983), *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983).

The next question is when this cause of action accrued. Defendants contend that since the complaint alleges that the breach occurred "as early as 1983," these claims are untimely. Plaintiff argues that the contractual claims accrued continually each time he received the benefits in question, and that the MISP/MOST claim accrued when defendants rejected his request for retroactive benefits in 1991.

■ The date of accrual of the MISP/MOST claim, since it is governed by ERISA, is determined according to federal law. *Keating v. Carey*, 706 F.2d 377 (2d Cir.1983). The six-year limitations period

on an ERISA claim begins to run "when there has been 'a repudiation by the fiduciary which is clear and made known to the beneficiaries.'" *Miles*, 698 F.2d at 598 (emphasis omitted) (quoting *Valle v. Joint Plumbing Indus. Bd.*, 623 F.2d 196, 202 n. 10 (2d Cir.1980)).

■ In the case at bar, there was no clear repudiation of Smith's claim for retroactive application of the 1.33 formula to the MISP/MOST contributions until defendants denied his claim in 1991. The Rotelcom Sales Commission Plans that were provided to employees made it less than clear whether MISP/MOST benefits were included in that formula. The 1982 plan listed the Management Investment Savings Plan among the benefits provided, and it also stated that "the base for benefit compensation shall be 133% of base salary ..." This certainly could have led employees to believe that MISP/MOST was covered by the 1.33 formula.

The fact at least some employees did believe that is reflected by a memorandum dated September 20, 1982 from D.J. Doyle, Jr., the then-General Manager of Rotelcom, to W. Schafer, the Comptroller, advising Schafer that it was "imperative that we evidence to our sales people that their benefits are established at 133% of their base salary as promised." (Def.Ex. Y). Doyle stated that "The matter of incentive savings *must* be resolved.... This item is an enormous bone of contention—a festering sore. We have promised them the 133% option."

At a meeting on September 21, 1982, Schafer and other benefits personnel concluded that the 1.33 benefit level should apply to both employees' and the employer's contributions under the incentive savings plan. (Def.Ex. Z). That recommendation was followed in the case of two employees whose draw had been eliminated in May 1982. In January 1983, they were given a one-time "trueup" designed to bring their benefits for 1982 up to the correct level. (Def.Exs. AA, AB). It was determined that Smith was not entitled to a trueup, since his draw had not been elimi-

nated until December 31, 1982. (Def.Ex. AA).

Defendants allege that the two employees who received the "trueup" were unwilling to increase their own MISP/MOST contributions under the 1.33 adjustment, and that the adjustment was therefore dropped in 1983. Accorso Aff. ¶ 24. Smith alleges that he was aware from conversations with one of those employees in 1982 that she had received the "trueup", and he therefore assumed that defendants would continue to apply the 1.33 formula. Smith Aff. ¶ 16. He states that he never tried to verify that fact, however, until this lawsuit began.

Defendants have shown no proof that Smith was ever made aware during his employment that his assumption was incorrect. Although Smith received statements showing the amounts of the contributions that had been made to his account, they did not explain how those amounts had been derived. *See* Def.Exs. D, E. It is possible that Smith could have examined these statements and mathematically deduced that the proper formula was not being applied, but that hardly constitutes a clear repudiation of his claim.

Materials provided to employees after the 1.33 formula was abandoned also failed to make the facts clear. The 1984 Commission Sales Plan simply omitted any reference to the formula. I do not accept defendants' argument that that omission put Smith on notice that the formula was not being used for MISP/MOST. Even if an astute employee might have been prompted by this to make some inquiry into the matter, mere silence did not make defendants' position "clear and made known to the beneficiaries." *Miles*, 698 F.2d at 598.[6] In light of these ambiguities, I also do not believe that Smith's inaction constituted the sort of deliberate ignorance that might

justify applying an earlier accrual date to this cause of action.

Case law from the Second Circuit supports this position. In *Larsen v. NMU Pension Trust*, 902 F.2d 1069, 1073–74 (2d Cir.1990), for example, the plaintiff, an employee's widow, had been informed when she began receiving survivor's benefits in August 1980 that she would be entitled to twenty-six payments of pension benefits, with the final payment due September 1, 1982. After the final payment was made, the plaintiff inquired about the termination of her benefits, and in a letter dated December 6, 1985, the plan informed her that "All monies have been paid that are payable and there are no further monies due [the plaintiff]." The plaintiff filed her complaint in October 1986.

On appeal by defendants from a denial of their motion to dismiss the complaint as time-barred, the Court of Appeals affirmed, holding that the earliest time at which a clear repudiation of the plaintiff's rights could be said to have occurred was December 6, 1985. The court ruled that the August 1980 letter was not pivotal, since the letter "did not explain what those payments represented, or that they were granted *instead of* life-time survivor's benefits." *Id.* at 1074. *See also Miles*, 698 F.2d at 598–99 (upholding district court's finding that although plaintiffs' application to be treated as "new group" entitled to past service credit under pension plan was rejected in 1969, plaintiffs did not receive clear notice that plan trustees had repudiated their claim until 1976 when retiring plaintiff's application for a pension was denied); *Valle*, 623 F.2d at 202 n. 10 (although defendants clearly stated in 1969 that plaintiff was not eligible for benefits, subsequent letters from defendants sufficiently clouded defendants' position that

---

**6.** Defendants have been unable to determine to their own satisfaction when employees became aware that MISP/MOST contributions were not being adjusted. In a March 22, 1991 memorandum prepared for the EBC, Ruth Accorso, Rotelcom's Supervisor of Compensation and Benefits, states that "I have not been able to determine whether or not the management sales employees were advised that this [1.33] adjustment no

longer would be made." Def.Ex. AE. In an April 3, 1991 memo regarding Smith's claims, she states that "there is some probability that there was *some* communication to these individuals that the MISP/MOST adjustment had been eliminated," but she admits that it is "virtually impossible" to determine now whether or when such communication occurred. *Id.* (emphasis in original).

limitations period did not commence until trustees finally clarified position in 1974 by denying claim).

I conclude, then, that Smith's claim concerning the MISP/MOST plan was not clearly repudiated, and thus did not accrue, until 1991. This cause of action is timely insofar as it relates to MISP/MOST.

■ The claim for retroactive vacation and other non-ERISA benefits is governed by New York law. On state law claims, a federal court will look to state law to determine the time when the limitations period commenced. *Personis v. Oiler*, 889 F.2d 424, 426 (2d Cir.1989).

■ I find that under New York law, the claim for non-ERISA benefits accrued continually each time Smith received such benefits. In New York, claims under a contract which calls for performances over a period of time accrue each time that a breach of the contractual obligations occurs. *Bulova Watch Co. v. Celotex Corp.*, 46 N.Y.2d 606, 611, 415 N.Y.S.2d 817, 389 N.E.2d 130 (1979).

The same rule applies to contractual wage claims. Such claims allege continuing violations, and are therefore timely for any unpaid wages within six years of the filing of the complaint. For example, in *Park Terrace Gardens, Inc. v. Bevona*, 161 A.D.2d 510, 555 N.Y.S.2d 780 (1990), *appeal denied*, 77 N.Y.2d 802, 566 N.Y.S.2d 587, 567 N.E.2d 981 (1991), several employees and their union brought a claim in 1985 for wages allegedly owed them under a collective bargaining agreement as far back as 1978. The court held that the alleged violation was a continuing one, and that any wage claims that accrued no more than six years before 1985 were timely.[7]

Here, Smith contends that his rights arise from promises made by Rotelcom to Smith and other employees in 1982 and reaffirmed in 1983. Although the complaint alleges that defendants breached

those promises "as early as 1983," it also alleges that the breach continued from then on. This was not merely a one-time breach, then, but a continuing one.

I also do not accept defendants' contention that there is no continuing violation here because the 1.33 adjustment was replaced by a new plan in 1984 or because Smith did not complain about his vacation and other benefits until 1991. Smith admits that he was aware for some time that defendants were not using the formula for vacation benefits, but states that he "rather trusted from previous experience that the company would apply that rule that it introduced and that in the event that something like that was missed there would always be an opportunity to be adjusted appropriately." Smith Deposition, 12/21/90, at 227.

These issues may bear on the ultimate merits of the claims, but as to the statute of limitations, they do not alter Smith's contention that defendants remained bound by their alleged promise, and that they committed continuing violations of that promise. For statute of limitations purposes, "[a] claim of this nature must be deemed to have accrued on the date that the plaintiff *claims* the breach of the employer's alleged obligation occurred, without regard to whether the claim has merit or whether the claimant has even accurately identified the event which would have triggered his rights, if such rights existed." *Hall v. United Parcel Service of America, Inc.*, 76 N.Y.2d 27, 36, 556 N.Y.S.2d 21, 555 N.E.2d 273 (1990).

■ I conclude, therefore, that the state law claims are timely insofar as they relate to benefits which were or should have been received within six years of the effective date of the filing of the complaint. This, however, brings up the final question concerning the limitations issue, which is whether the sixth cause of action, which was raised in the amended complaint filed on June 25, 1991, should relate back to the

---

7. *Park Terrace* involved an application by the employer to stay arbitration proceedings that had been triggered by the union's filing of a notice of claim in 1985. However, the court expressly applied the contract limitations period in C.P.L.R. § 213(2), and the court's reasoning is fully applicable here.

date of filing of the original complaint on January 22, 1990.

Rule 15(c) of the Federal Rules of Civil Procedure provides that

An amendment of a pleading relates back to the date of the original pleading when

(1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading ...

Subsection (2) has long been the federal rule. Subsection (1) was recently added by Congress, and makes clear that if the claim arises under state law, or if the court borrows a state statute of limitations, relation back is to be determined by whichever procedural rule gives the most favorable result to the plaintiff. *See* Fed.R.Civ.P. 15, Notes of Advisory Committee on 1989 proposed amendments to Rule.

In the case at bar, the limitations period used here is that provided by New York law. The standard in New York for relation back of amended pleadings is contained in C.P.L.R. § 203(e), which states that

A claim asserted in an amended pleading is deemed to have been interposed at the time the claims in the original pleading were interposed, unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading.

Although this rule is worded somewhat differently from Rule 15(c)(2), the differences between them in practice appear to be slight. One commentator has stated that under the federal standard, "if the alteration of the original statement is so substantial that it cannot be said that defendant was given adequate notice of the conduct, transaction, or occurrence that forms the basis of the claim or defense, then the amendment will not relate back ..." 6A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 1497, pp. 76–79 (2d ed. 1990). This comes close to the wording of C.P.L.R. § 203.

I find that the amended complaint does not relate back either under Rule 15(c)(2) or under New York law. As stated, both rules require some consideration of whether the original pleading put the defendant on notice of the matters underlying the amended pleading. In the case at bar, the sixth cause of action concerns vacation pay, MISP/MOST contributions, and other benefits, none of which were the subject of the original complaint.

Many of the relevant events in the sixth cause of action also predate the events of 1989 which form the basis of the other causes of action. The alleged promises giving rise to this claim were made in 1982 and 1983, and the alleged breach occurred as early as 1983. In contrast, the claims asserted in the original complaint relate only to the events surrounding Smith's retirement in 1989.

The relevant documents are also different as to the sixth cause of action. The claims in the original complaint arose out of the Pension and Pre–Pension Leave Plans. The sixth cause of action involves the MISP/MOST plan, as well as the 1982 and 1983 Commission Sales Plans. The 1.33 formula described in the latter plans was never mentioned in the original complaint, and I am therefore not persuaded by Smith's argument that the 1.33 adjustment forms a direct link between the original and amended complaints. Although the sixth cause of action ties this formula both to the pension benefits and to the MISP/MOST contributions, the fact remains that the formula itself was never mentioned in this case until the filing of the amended complaint. It cannot be said, then, that defendants were put on notice by the original complaint that the 1.33 provision would become an issue in the case.

I conclude that the sixth cause of action, insofar as it relates to benefits other than MISP/MOST contributions, is timely as to all such benefits which plaintiff alleges were first due him on or after June 25, 1985.

As far as the merits of the sixth cause of action are concerned, defendants argue that their decision denying Smith's claims in 1991 should be given deference because the decision was neither arbitrary nor capricious.

While I express no view as to the ultimate merit of Smith's claims, the preceding discussion concerning the statute of limitations makes clear that this cause of action involves genuine issues of material fact concerning what promises, if any, were made to the sales employees, and whether any contractual obligations were breached. Therefore, I deny defendants' motion for summary judgment on this cause of action.

### 7. Right to a Jury Trial

Smith has made a demand for a jury trial on his first, second, fifth, and sixth causes of action. Defendants move to strike the demand on the ground that jury trials are not available in ERISA cases.

The jury trial demand is now moot as to the first, second, and fifth causes of action, since I have granted judgment to one side or the other on all those claims. The only remaining claim subject to the demand is the sixth cause of action, which relates to benefits governed both by state law and by ERISA.

Defendants' motion is based in part on the assumption that none of plaintiff's state claims would survive their summary judgment motion. Since that is not the case, defendants' position on the jury trial issue is not clear.

It also has not been definitively resolved in the Second Circuit whether jury trials are available in ERISA cases. *See Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir.1984), *cert. denied sub nom. Cody v. Donovan*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *see also Clay v. ILC Data Device Corp.*, 771 F.Supp. 40, 46 (E.D.N.Y.1991); *Resnick v. Resnick*, 763 F.Supp. 760, 765 (S.D.N.Y.1991). If they are not, there could be some effect on the right to a jury trial on the state law claims. *See Resnick*, 763 F.Supp. at 766.

In view of the present posture of the case, I decline to decide the motion at this time. Since a trial date has not yet been set, no prejudice will result to either party. I will therefore defer deciding the motion to strike plaintiff's demand for a jury trial.

### CONCLUSION

For these reasons, it is hereby

ORDERED that defendants' motion for summary judgment is granted as to the fourth and fifth causes of action, both of which are dismissed with prejudice. The motion is also granted in part as to the first cause of action. The motion is denied as to the second, third and sixth causes of action. It is further

ORDERED that plaintiff is granted summary judgment as to the second cause of action, and is granted summary judgment in part as to the first cause of action. The parties are directed to *submit* proof of damages on the first and second causes of action within twenty (20) days of the date of entry of this order, absent a stipulation.

IT IS SO ORDERED.