**Loretta M. SHAPIRO, Plaintiff,**

v.

**NEW YORK UNIVERSITY,
et al, Defendants.**

No. 08 Civ. 6538 (CM)(DCF).

United States District Court,
S.D. New York.

July 30, 2009.

David Lobl, Joseph N. Salomon, Schwartz & Salomon, P.C., New York, NY, for Plaintiff.

Daniel Todd Driesen, Sapir & Frumkin LLP, White Plains, NY, for Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge:

### I. Background

Plaintiff Loretta Shapiro (hereinafter "Shapiro") brings this lawsuit against defendants New York University, New York University School of Medicine, New York University School of Medicine Defined Benefit Retirement Plan, New York University Medical Center, and NYU Hospitals Center (hereinafter "Defendants") for recovery of pension benefits pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B). Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff opposes the motion and cross moves for summary judgment.

Shapiro was an employee of New York University School of Medicine ("NYU-SOM"), a division of New York University. (Def.'s Rule 56.1 Stmt. ¶ 1.) She worked as the Billing Coordinator for the Cardiac Catheterization Unit from 1982 until August 2000 (Shapiro Aff. ¶ 3.), when she was laid off due to the outsourcing of her job duties. (Def.'s Rule 56.1 Stmt. ¶ 3.)

### A. Plan Specifications

As an incident of her employment with NYUSOM, Shapiro is a participant in the New York School of Medicine Defined Benefit Retirement Plan ("the Plan"), (id. ¶ 4.), which was one of several plans that together constituted the Health Services Retirement Plan (the "HSRP"). (Id. ¶¶ 5, 7.)

The Plan is an employee pension or retirement plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"). (Id. ¶ 5.) At the time of Shapiro's employment, the Plan was one of several pension and retirement plans administered by the HSRP. (Id. ¶ 5.) In 2002, the Plan withdrew from the composite HSRP, (id. ¶ 7.), but the HSRP continues to act as the Plan's third party administrator. (Id. ¶ 26.)

The Plan defines "Compensation" as:

Compensation paid by an Employer ... to a Participant for Covered Employment which is included or properly includible in the Wage and Tax Statements (Form W–2) filed with the Internal Revenue Service, [... but] Compensation shall not include overtime pay (including any earning from hours of employment in excess of the Full Time standard of employment), *bonuses*, [...] nor any portion of such compensation identified as reimbursement for expenses for uniforms and like items.

(*Id.* ¶ 10.) (emphasis added). The Plan expressly provides that "Compensation" excludes bonus income. (*Id.* ¶ 9.) Additionally, both the Summary Plan Description ("SPD") in effect at the time of Shapiro's termination and the current SPD inform Plan participants that "compensation does *not* include ... bonuses." (*Id.* ¶¶ 11, 12.) (emphasis in original).

The Plan gives discretion to the Plan Administrator in administering the Plan, stating that:

> The Plan shall be administered by the Plan Administrator in accordance with the Trust Agreement and this Plan. The Plan Administrator shall have complete authority, in its sole and absolute discretion, to construe and interpret the terms of the plan and the Trust Agreement (and any related documents and underlying policies) including, without limitation, the authority to:
> (a) take all actions and make all decisions with respect to the eligibility for, and the amount of, benefits payable under the Plan;
> (b) formulate, interpret and apply rules, regulations and policies necessary to administer the Plan in accordance with its terms;
> (c) decide questions, including legal or factual questions, relating to the calculation and payment of benefits under the Plan including questions concerning the granting of Service;
> (d) resolve and/or clarify any ambiguities, inconsistencies and omissions arising under the Plan or other Plan or other Plan documents; and
> (e) determine the standard of proof required in any case and process, and approve or deny, benefit claims and rule on any benefit exclusions.
> All determinations made by the Plan Administrator with respect to any matter arising under the Plan shall be final, conclusive and binding on all persons. The Plan Administrator may delegate such duties or powers as it deems necessary to carry out the administration of the Plan.

(*Id.* ¶ 14.) At all times relevant to this action, the Plan Administrator was New York University. (*Id.* ¶ 15.) NYU delegated the authority to administer the terms of the Plan to Nancy Sanchez, who is currently Vice Dean and Senior Vice President of Human Resources. (*Id.* ¶ 16.)

### B. ADD COMP Payments

In addition to her base salary, in years 1997 through 2000, Shapiro received an additional sum based on the billing levels achieved in the Cardiac Catheterization Laboratory (hereinafter "ADD COMP payments"). (*Id.* ¶¶ 18, 19.) Defendants characterize the additional sums as "additional income in excess of her normal salary," which were referred to at various times as "incentive compensation," "supplemental compensation," and "bonus pay." (*Id.* ¶¶ 18, 20.) Shapiro disputes this characterization, asserting that the terms that Defendants use, "normal salary" and "salary," are not contained in the Plan's definition of "compensation." (Pl.'s Rule 56.1 Stmt. ¶¶ 18, 19.) Shapiro admits that her "Percentage Compensation" was based on billing levels achieved by the Catheterization Laboratory. (*Id.* ¶ 19.)

For the purposes of financial record keeping, the payroll department coded these payments as "ADD COMP," which means "additional compensation." (Def.'s Rule 56.1 Stmt. ¶ 21.) In reporting Shapiro's earnings information to the HSRP for the purpose of pension computation, the School of Medicine (which had her on its payroll) included these ADD COMP payments. (*Id.* ¶ 23.) Defendants claim that the inclusion of the ADD COMP payments in the pension calculation was inadvertent,

and that the ADD COMP payments were in the nature of a bonus, and so are not pensionable under the terms of the Plan. (*Id.*) Shapiro disputes NYU's characterization of the ADD COMP payments as not being part of her "regular earnings." (Pl.'s Rule 56.1 Stmt. ¶ 23.) Furthermore, Shapiro disputes that NYU "inadvertently" included the ADD COMP payments in the calculation of pensionable income; Shapiro contends that these payments were consistently treated as pensionable earnings throughout the course of her employment and until July 2007, when Shapiro finally applied for retirement benefits. (*Id.*)

## C. Pension Estimates

Before she applied for retirement benefits in July 2007, Shapiro requested and received pension benefit estimates in 2000 and 2004. (Def.'s' Rule 56.1 Stmt. ¶ 24.) These estimates were based on a calculation of pensionable income that included the ADD COMP payments. (*Id.* ¶ 25.)

The letter accompanying the estimate in 2000 stated that the pension calculation was based on "unverified records" and that "any change ... in the interest rate environment, employment dates, pension coverage, salary, or other information on file may affect ... the amount of the estimates calculated." (Sanchez Aff., Ex. 9.) The letter accompanying the 2004 estimate said that it was based on "verified computer records," but nevertheless reiterated that "any change ... in the interest rate environment, employment dates, pension coverage, salary, or other information on file may affect ... the amount of the estimates calculated." (*Id.*, ex. 10.)

## D. Plaintiff's Application for Pension Benefits and Appeal

In March 2007, Shapiro submitted an application for pension benefits to HSRP. (Def.'s Rule 56.1 Stmt. ¶ 26.) In an e-mail

dated July 2, 2007, HSRP alerted Defendants to a possible discrepancy in Shapiro's income for the year 2000. (*Id.* ¶ 127.) As a result, Defendants reviewed all the salary information that had been included in Shapiro's pension calculation, (*id.* ¶ 28), and corrected her pensionable earnings from 1997–2000 by excluding the ADD COMP payments. (*Id.* ¶ 29, 30.)

Shapiro disputes Defendants' statement that the 2000 and 2004 estimates as being incorrect and contends that neither NYU nor the Plan Administrator had the right under the Plan to "correct" any aspect of Shapiro's pensionable earnings. (Pl.'s Rule 56.1 Stmt. ¶¶ 28–30.)

In a letter dated June 29, 2007, the HSRP sent Shapiro a new pension benefit estimate, based on the revised calculations of her earnings, which excluded the ADD COMP payments. (Def.'s Rule 56.1 Stmt. ¶ 31.) The letter directed Shapiro to elect the payment option she desired. (*Id.*)

Instead of selecting a payment option, Shapiro sent a letter to Defendants asking for an explanation of the decrease in her pension benefit estimates. (*Id.* ¶ 35.) Because she did not select a payment option, pension benefits based upon the undisputed portion of her compensation did not and have not been paid. (*Id.* ¶ 34.) Shapiro argues that she did not sign the June 2007 letter directing her to select a payment option because that would have required her to "verify" her earnings as excluding the ADD COMP payments. (Pl.'s Rule 56.1 Stmt. ¶ 31.)

In a letter dated July 18, 2007, the HSRP informed Shapiro that the most recent calculations were based on a revised earnings report received from Defendants, and that "pensionable earnings are not the same as your W–2 tax statement." (Def.'s Rule 56.1 Stmt. ¶ 36.)

On August 21, 2007, Shapiro, by her attorneys, requested that the Plan pay her monthly pension benefits based on a pensionable income that included the ADD COMP payments. (*Id.* ¶ 37.)

In an undated letter, sent in or about November 2007, the Plan denied Shapiro's request that benefits be calculated with the ADD COMP payments. (*Id.* ¶ 40.) The decision was based on the Plan Administrator's interpretation of the term "Compensation," which she interpreted to exclude the ADD COMP payments. (*Id.* ¶ 41.) The letter went on to state that:

New York University has consistently interpreted the term "overtime pay and bonuses" to include a number of pay codes on the ... payroll system that are attributable to pay in excess of a participant's base salary for his or her regularly scheduled work week, with the result that amounts characterized by such pay codes are excluded from the determination of an employee's Plan compensation. The "ADD COMP" is one such code. When Ms. Shapiro requested a benefit estimate, the estimate provided to her was based on the mistaken inclusion of this overtime/bonus pay for the years 1997–2000. This is why the erroneous employment history verifications show her as experiencing a pay increase of more than $30,000 between 1996 and 1997 She did not, in fact, have such a pay increase—rather, the verifications properly excluded her overtime pay from her Plan compensation prior to 1997 and mistakenly included her overtime pay between 1997 and 2000.

(Sanchez Aff., Ex. 18.)

In a letter dated January 15, 2008, Shapiro appealed the Plan Administrator's decision to characterize the ADD COMP payments as overtime or bonus payments, thus exempting them from the calculation of her pensionable income. (Def.'s Rule 56.1 Stmt., ¶ 44.) Shapiro contended that "NYU has erroneously concluded that the variable component of her compensation, which was classified as 'ADD COMP', was for overtime or a bonus" and objected to "NYU's post-retirement re-characterization of the terms of her employment to eliminate the variable or percentage component of her earnings from her 'pensionable compensation.'" (Shapiro Aff., Ex. 20.) Furthermore, Shapiro argued that her ADD COMP payments should not be classified as either overtime or bonus: "The payment of the variable component to Ms. Shapiro was not discretionary, was not dependent on the decision of any other person or persons, and was not dependent on the number of hours she worked." (*Id.*)

In a letter dated April 10, 2008, Nancy Sanchez, NYU's Senior Vice President and Vice Dean of Human Resources, denied Shapiro's appeal. (Def.'s Rule 56.1 Stmt. ¶ 47.) Ms. Sanchez advised Shapiro that she agreed with Plaintiff's characterization of her compensation structure as being in one part fixed rate and in one part variable, but did not alter her conclusion that the "variable" compensation was in the nature of a bonus:

This variable component of pay was clearly in the nature of a bonus. It was payable up to two times a year only if the criteria were satisfied, and the amount was dependent upon the department's collections. New York University's characterization of this compensation as ADD COMP was consistent with the nature of this variable pay, that is, a form of bonus pay that was paid in addition to Ms. Shapiro's base pay.... Because pay coded as "ADD COMP" is, and consistently has been, classified by New York University as excluded from the Plan's definition of compensation because it represents bonus pay, it cannot

be included in the calculation of a participant's Plan benefits.

(Sanchez Aff., Ex. 21.) Ms. Sanchez acknowledged that the prior benefit estimates were erroneously based on the inclusion of the ADD COMP payments, but asserted that, under the terms of the Plan, benefits paid to participants must be based on "actual data." (*Id.* ¶ 54.) Accordingly, Defendants concluded that Shapiro was not entitled to inclusion of the ADD COMP payments and the appeal was denied. (*Id.*)

### E. Comparators

In the course of discovery, Shapiro requested that Defendants identify each instance "where a participant in the Plan received percentage compensation such as the Plaintiff received (i.e., that was calculated by applying a percentage rate to revenue collected)." (Pl.'s Req. for Interrogs. ¶ 5.)

In response, Defendants stated that, "The Plan is unaware of participants who received bonus income as described in the interrogatory during the period in which Plaintiff received similar bonus compensation, to wit, 1997–2000." (Def.'s Resp. to Interrogs. ¶ 5.) However, Defendants were "... aware of five participants who received bonuses responsive to the interrogatory" after 2000. (*Id.*) These five School of Medicine employees received increased compensation from a bonus pool, on a per patient basis, in exchange for executing non-competition agreements. (Def.'s Rule 56.1 Stmt. ¶ 56.)

The payroll department recorded these payments differently from year to year. In 2002, the bonuses were coded as "ADD COMP;" in 2003 they were coded as "OT BONUS;" and in 2005 they were coded as "BONUS." (*Id.* ¶¶ 57, 58.) None of the bonuses were meant to be included as pensionable income under the Plan. (*Id.*

¶ 59.) However, the bonuses coded as "ADD COMP" were included as pensionable income in the census report sent to the Plan actuary. (*Id.* ¶ 60.) Defendants assert that the Plan discovered and corrected the errors and submitted revised earnings amounts that excluded the income coded as "ADD COMP." (*Id.* ¶ 61.) The Court does not know when this correction occurred.

Shapiro asserts that the fact that NYU had the ability to code or label compensation paid to employees as "BONUS" indicates that such payments were actually bonuses. From this she concludes that payments labeled otherwise are *not* bonuses. (Pl.'s Rule 56.1 Stmt. ¶ 59.) Shapiro also asserts that the original treatment of the 2002 ADD COMP payments to the comparator employees proves that "ADD COMP" was supposed to be treated as pensionable income. (*Id.* ¶ 61.)

### F. The Instant Action

Shapiro brings this case under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), to recover benefits allegedly due to her under the terms of the Plan. Plaintiff claims that the decision and determination to deny her benefits based on the inclusion of her ADD COMP payments was "arbitrary and capricious, irrational, erroneous, [and] in violation of the terms of the plan and ... ERISA." (Def.'s Rule 56.1 Stmt. ¶ 62.)

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff opposes the motion and cross moves for summary judgment; she also claims that she is entitled to attorney's fees under ERISA.

### II. Standard of Review for Motions for Summary Judgment

A party is entitled to summary judgment when there is no "genuine issue of

material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Industries Co.*, 475 U.S. at 586, 106 S.Ct. 1348.

## III. The Denial of Benefits Was Not Improper

### A. Standard of Review

■ In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. 948. When discretion is reserved for the administrator to interpret the terms of the benefit plan, the denial of benefits is reviewed under a deferential standard. *Id.* at 102, 109 S.Ct. 948.

The Second Circuit has interpreted this "deferential standard" to be the "arbitrary and capricious" standard. *See, e.g. Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir.1995) (holding that a Retirement Committee's interpretation of the Plan's provision should be reviewed under the arbitrary and capricious standard because the Plan authorized the Committee to exercise its interpretive discretion).

### B. Discretion Granted to the Plan Administrator

■ The Supreme Court did not outline how specific a grant of discretion must be in order to overcome the presumption of de novo review. *Id.* In deciding the appropriate standard, therefore, a court must determine whether applicable language of the plan gives the administrator discretionary authority to interpret the plan's provisions. *Schein v. News America Publ'g, Inc.*, No. 89 Civ. 0052, 1991 WL 117638, at *4 (S.D.N.Y.1991). Although a plan does not need "magic words" such as "discretion" and "deference" to avoid *de novo* review, *Jordan*, 46 F.3d at 1271, it must

nevertheless, give some unambiguous indication that discretion has been conferred. *Kosakow v. New Rochelle Radiology Assoc., P.C.,* 274 F.3d 706, 739 (2d Cir.2001).

In *Jordan,* the Second Circuit discussed several instances in which application of the arbitrary and capricious standard was appropriate because the language of the plan conferred discretion on plan administrators to interpret the terms of the plan. *Jordan,* 46 F.3d at 1270. The arbitrary and capricious standard was appropriate, for instance, when the plan at issue gave the trustees the power "to construe the provisions of this Trust Agreement and Plan," and provided that any construction adopted by the Trustees in good faith would be binding. *Id.* (quoting *Jones v. Laborers Health & Welfare Trust Fund,* 906 F.2d 480, 481 (9th Cir.1990)). That standard of review was also appropriate where the plan at issue granted trustees "full and exclusive authority to determine all questions of coverage and eligibility, ... full power to construe the provisions of this Agreement, [and] the terms used herein" and "authority to interpret the Plan and ... determine all questions arising in the administration, interpretation and application of the Plan." *Id.* (internal quotations omitted) (quoting *Batchelor v. International Bhd. of Elec. Workers Local 861 Pension & Ret. Fund,* 877 F.2d 441, 443 (5th Cir.1989)).

The Second Circuit ultimately decided that the relevant language in *Jacobs* was sufficient to support the more deferential standard. *Id.* The Plan provided that "the Retirement Committee shall pass upon all questions concerning the application or interpretation of the provisions of the Plan." *Id.* at 1269. The court reasoned that this language "confers upon the Retirement Committee the power of 'interpretation,'" *id.* at 1270, and "in exercising that power, the Retirement Committee necessarily must evaluate and determine facts, which task is inherently a judgmental function." *Id.* (internal citations omitted).

In the present case, the Plan's reservation of discretion for the Plan Administrator is even more specific than the provision at issue in *Jacobs.* The Health Services Retirement Plan gives the Plan Administrator a broad grant of discretion in administering the Plan:

> The Plan Administrator shall have complete authority, in its sole and absolute discretion, to construe and interpret the terms of the plan and the Trust Agreement (and any related documents and underlying policies) including, without limitation, the authority to:
>
> (a) take all actions and make all decisions with respect to the eligibility for, and the amount of, benefits payable under the Plan;
>
> (b) formulate, interpret and apply rules, regulations and policies necessary to administer the Plan in accordance with its terms;
>
> (c) decide questions, including legal or factual questions, relating to the calculation and payment of benefits under the Plan including questions concerning the granting of Service;
>
> (d) resolve and/or clarify any ambiguities, inconsistencies and omissions arising under the Plan or other Plan or other Plan documents.

(Sanchez Aff., Ex. 3.) The Plan's reservation of interpretive discretion in the Plan Administrator is unambiguous. The relevant language is more specific in conferring such discretion than *Jacobs* or any of the cases that *Jacobs* discusses.

Because the plan gives "discretionary authority" to the Plan Administrator to "construe the terms of the plan," *Firestone,* 489 U.S. at 115, 109 S.Ct. 948, this Court will review the denial of Plan bene-

fits under the arbitrary and capricious standard.

### C. The Plan Administrator's Interpretation is Not Arbitrary or Capricious

■ The question, therefore, is whether it was arbitrary and capricious for the Plan Administrator to interpret the Plan to exclude Shapiro's ADD COMP payments from her pensionable income. Plaintiff argues that Defendants acted in an arbitrary and capricious manner in "reinterpreting an unambiguous term so as to deny plaintiff pension benefits which had consistently been promised and verified to her." (Pl.'s Mem. in Opp'n of Def.'s Mot. for Summ. J. at 17.) Defendants argue that the Plan Administrator's decision to conclude that the ADD COMP payments were in the nature of a bonus, and so were not part of pensionable income, was within her discretion under the terms of the Plan.

#### 1. The Plan Administrator

Under the terms of the Plan, the Plan Administrator "means the Sponsor [NYU] or any individual, entity or committee appointed by the Sponsor for the purpose of administering the Plan and designated by the Sponsor as Plan Administrator." (Sanchez Aff., Ex. 2.)

Nancy Sanchez acted as the Plan Administrator at relevant times. (*Id.* at ¶ 17.)

#### 2. The Plan Administrator's Interpretation

■ The arbitrary and capricious standard of review is highly deferential to a plan administrator. *Jordan*, 46 F.3d at 1271. The reviewing court must defer to an administrator's "reasonable" interpretation. *Id.* The court may not substitute its own judgment for that of the Plan Administrator. *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir.1995) (citing *Bow-*

*man Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). The question before a reviewing court is "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Jordan*, 46 F.3d at 1271 (quoting *Bowman*, 419 U.S. at 285, 95 S.Ct. 438).

■■ A decision to deny benefits may be overturned as arbitrary and capricious if "the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (quoting *Pagan*, 52 F.3d at 442). Furthermore, "where both the trustees of a pension fund and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control." *Miles v. N.Y. State Teamsters Conference Pension and Ret. Fund Employee Pension Benefit Plan*, 698 F.2d 593, 601 (2d Cir.1983).

#### a. The Term "Bonus" is Ambiguous

Plaintiff argues that the Plan Administrator's denial of benefits was arbitrary and capricious because the term "bonus" is unambiguous and her compensation was not in the nature of a bonus. (Pl.'s Mem. in Opp'n of Def.'s Mot for Summ. J. at 12.) Plaintiff contends that discretion to interpret a plan can only be exercised where there is an ambiguity in the terms of the plan, *O'Neil v. Ret. Plan for Salaried Employees of RKO Gen., Inc.*, 37 F.3d 55 (2d Cir.1994), and that the ADD COMP payments unambiguously do not fall under the "bonus" exception in the Plan's definition of pensionable compensation.

Shapiro cites *O'Neil* in support of her argument. In *O'Neil*, the plaintiffs were

former executives and participants in defendant RKO's retirement pension plans. *Id.* at 56. The plaintiffs sued under ERISA when the committee responsible for administering the retirement plans decided that payments received by plaintiffs under the Stock Incentive Compensation Plan ("SICP") were not includible in plaintiffs' pensionable earnings. *Id.* The term "earnings" was defined under the plan as: "the regular salary paid to a Participant by the Employer during the calendar year, ... including ... bonuses [and] so-called Incentive or Additional Compensation paid to the Employee during the calendar year." *Id.* The RKO Plans also provided that the Committee had the power "to interpret the Plan, and to resolve ambiguities, inconsistencies and omissions." *Id.*

The plaintiffs moved for summary judgment, claiming that the SICP payments were unambiguously included in the definition of "Earnings." The district court denied plaintiffs' motion for summary judgment and after a four day trial, entered judgment for the defendants. *Id.*

In reviewing the district court's denial of summary judgment, the Second Circuit noted that "where ... plan language categorically states that certain benefits will be provided, *de novo* review is appropriate because unambiguous language leaves no room for the exercise of discretion." *Id.* at 59. Language is ambiguous "when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* (citations omitted).

Ultimately, however, the Second Circuit applied the "arbitrary and capricious" standard to the language at issue—not the *de novo* standard—and affirmed the district court's decision. *Id.* at 59. Significantly for our purposes, the SICP payments were deemed by the Circuit not to

be unambiguously pensionable earnings, as the plaintiffs contended. The Court of Appeals ruled that the SICP payments (1) did not fall precisely within the definition of "Earnings," and (2) seemed to refer to a specific type of payment. *Id.*

In this case, the term "bonus" is at least as ambiguous, if not; more so, than the term "Earnings" was in *O'Neil.* It is not given a specific definition and is clearly capable of "more than one meaning when viewed objectively by a reasonably intelligent person." *Id.* For instance, a reasonably intelligent person could consider a "bonus" as variable pay over and above a salary that is based on some outside factor (like billing levels) as opposed to a regular salary. "Bonus" could also be interpreted as an incentive payment, to reward employees for achievements or hard work. In fact, "bonus" could refer to several types of payment.

### b. The Plan Administrator's Decision is not Arbitrary and Capricious

Under the arbitrary and capricious standard, a court must give great deference to a plan administrator's interpretation of a plan's terms. The court must yield to a plan administrator's "reasonable" interpretation, *Jordan,* 46 F.3d at 1271, even if the plaintiff's alternative interpretation of the plan's terms is also reasonable. *Id.* at 1273.

For instance, in *Smith v. Rochester Tel. Bus. Mktg. Corp.,* 786 F.Supp. 293, 298–99 (W.D.N.Y.1992), *aff'd,* 40 F.3d 1236 (2d Cir.1994), the court determined that the Employees' Benefits Committee's interpretation of a benefit plan was reasonable and passed muster under the arbitrary and capricious standard, even though the plaintiff offered a different, but also reasonable, interpretation.

The plaintiff in *Smith* brought suit against his former employer, claiming that

he was entitled to a monthly pension of $5581 under the Management Pension Plan rather than the $2400 that he was receiving. *Id.* at 297. Plaintiff contended that his pensionable income should have included his sales commissions, while defendant argued that the Committee had acted within its discretion in excluding the commissions from the calculation. *Id.* at 297–98.

The plan's formula for calculating benefits was based on a combination of years of service and "average compensation preceding retirement." *Id.* at 297 (internal citation omitted). The plan defined "compensation" as "the total of an Employee's base rate of pay and bonuses for personal services actually rendered by the Employee to the Employer.... Compensation does not include ... any types of extra remuneration (except bonuses) of whatever nature." *Id.* at 297–98.

The plan also provided that "The [Employees' Benefits] Committee shall interpret the Plan and shall determine all questions arising in the administration, interpretation, and application of the Plan. Any such determination by the Committee shall be conclusive and binding on all persons." *Id.* at 297.

The court determined that the Committee had discretion to determine what constituted compensation and applied the arbitrary and capricious standard in reviewing the decision to exclude plaintiff's sales commissions in the calculation of his benefits. *Id.* at 298. It granted defendants' motion for summary judgment on this issue because the Committee's decision to exclude sales commissions from the calculation of pension benefits was not unreasonable. *Id.* at 299. The court reasoned that commissions depended on sales, and they therefore constituted an addition to the employee's "base rate of pay." *Id.* The court further held

that the Committee had not erred in concluding that commissions were not bonuses, either, because (1) bonuses and commissions are two distinct programs of compensation; (2) defendants used two different names for the types of compensation, which indicated that the commissions were not intended to be included as part of an employee's compensation under the pension plan; and (3) the exclusion of commissions represented a long-standing interpretation of the plan. *Id.*

In the present case, the Plan Administrator's decision that Shapiro's ADD COMP payments were a "bonus," and so were not pensionable income, is certainly not arbitrary and capricious. The Plan Administrator states: "It was my determination that the additional payments received by plaintiff in excess of her base salary were properly deemed 'bonus' for purposes of exclusion from pensionable compensation. This decision was predicated on the variability, sporadic timing and attainability of the additional payments only if a specific threshold of collections was met." (Sanchez Aff. ¶¶ 51–52.) That cannot be said to be unreasonable.

Reinforcing the reasonableness of the Plan Administrator's determination, the ADD COMP payments to Shapiro were not made as part of the regular payroll cycle, but rather in response to a specific check request. The check requests sent to the payroll department variously characterized the earnings as "incentive compensation," "supplemental compensation" and "bonus pay." (Sanchez Aff., Ex. 7.) It is certainly reasonable to characterize as bonuses ADD COMP payments that were denominated in bonus-like terms when they were requested—and bonuses are clearly not part of pensionable income under the Plan.

Also as in *Smith,* the Plan Administrator avers that NYU has consistently taken the

position that income coded as ADD COMP by the School of Medicine is not pensionable income within the meaning of Section 1.06 of the Plan. (Sanchez Aff., Ex. 18, 21.) Plaintiff contests this, noting that the payment coded as ADD COMP to five School of Medicine employees was originally included, not excluded, from the employee's pensionable income, just as it was in Plaintiff's case. This is true, but it does not compel a finding in favor of Plaintiff, or even raise a disputed issue of material fact requiring a trial.

ADD COMP was a payroll code used by the School of Medicine, not by anyone involved in administering the Plan. In Shapiro's case, it was the School of Medicine employees (who are not charged with administration of the Plan) who characterized the ADD COMP payments as includable in "compensation" for pension calculation purposes. They did this when they reported the amount of Shapiro's pensionable income to HSRP, the third party administrator of the Plan. (Sanchez Aff. ¶ 24.) HSRP pension specialists uncovered the error in 2007 when Shapiro applied for her pension benefits. The same thing seems to have occurred with the payments in 2002; the School of Medicine included them in pensionable income for the five recipients and the HSRP representatives corrected the School of Medicine's error (Sanchez Aff. Ex. 24, p. 1 and ¶¶ 61–62.) It is New York University and its pension administrators, not the School of Medicine, that have "consistently" taken the position that payments coded as ADD COMP should not be included in pensionable income; nothing in the record suggests that this is not the case.

Finally, Shapiro argues that, because the Plan document itself does not specifically exclude payments labeled ADD COMP from its definition of pensionable income, ADD COMP payments must be included. But ADD COMP is a payroll code, not a type of income, and the Plan itself is not written in terms of payroll codes. Rather, it says that W–2 income less certain exclusions (overtime, bonuses, and reimbursement) falls within the ambit of "Compensation" for Plan purposes. Therefore, Shapiro's argument lacks merit.[1]

In light of the Plans' consistent position that (1) payments in the nature of those received by Shapiro were bonuses, and (2) payments coded ADD COMP by the School of Medicine were not pensionable income, the Plan Administrator's denial of benefits was neither arbitrary nor capricious.

### c. NYU as an Interested Party

█ Shapiro contends that because the Plan Administrator is an employee of NYU, she should be considered as "conflicted," and this conflict should be weighed as a factor in determining whether she abused her discretion in interpreting "bonus" to include the ADD COMP payments.

In *Firestone*, the Supreme Court held that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115, 109 S.Ct. 948 (internal citation omitted).

However, the Second Circuit concluded that "the simple fact that the administrator of a plan ... happens to be 'an arm of the employer' does not in itself create a conflict of interest." *Jordan*, 46 F.3d at

---

1. Shapiro's argument is, however, understandable in view of the fact that the Plan Administrator herself focused on payroll codes, rather than on the nature of the payment received, when she denied Shapiro's appeal. *See* Sanchez Aff., Ex. 18, 21.

1274 (quoting *Kotrosits v. GATX Corp. Non–Contributory Pension Plan for Salaried Employees,* 970 F.2d 1165, 1173 (3d Cir.1992)), *cert. denied,* 506 U.S. 1021, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992). Instead, the Second Circuit adopted the Supreme Court's balancing test, that "a conflict of interest is to be *'weighed as a factor* in determining whether there [wa]s an abuse of discretion.'" *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 128 (2d Cir.2008), quoting *Metropolitan Life Ins. Co. v. Glenn,* —— U.S. ——, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008) (emphasis in original).

In *McCauley,* the plaintiff applied for long-term disability benefits from his former employer. *Id.* at 133–34. The defendant insurance company denied his application based on information provided by the plaintiff's physician, but permitted plaintiff to appeal the decision by providing more medical information. *Id.* at 134. The Second Circuit concluded that this initial denial of benefits was not arbitrary and capricious because it was supported by correspondence from plaintiff's physician and other medical information on record. *Id.*

In his appeal, plaintiff submitted more information regarding his medical condition, listing specifically the issues that prohibited him from working. *Id.* at 135. The defendant again rejected plaintiff's application for benefits. *Id.* The nurse reviewing plaintiff's file stated that "no new medical [records] had been submitted" and that plaintiff's memorandum outlining his medical problems in detail was "not an official document from an attending physician." *Id.* (internal quotations omitted). When communicating this decision with the plaintiff, however, the defendant staled that "it had rejected the health problems listed in [plaintiff's] memorandum because 'these conditions were acknowledged by your physician on the initial application and in his narrative letter of March 1995.'" *Id.*

The Second Circuit found that defendant's reason for rejecting plaintiff's appeal was "unreasonable and deceptive" and that the denial of the appeal mischaracterized or blatantly ignored the detailed information provided by plaintiff. *Id.* at 135. The court found that those factors were exacerbated by the insurance company's conflict of interest, as both administrator and payor, concluding that the conflict of interest influenced the defendant to avoid following up on issues and ignoring important details. *Id.* at 136. Furthermore, the court noted that the defendant insurance company had a long history of biased claims administration. *Id.* at 137. The combination of all those factors led the Second Circuit to conclude that the denial of plaintiff's disability benefits in *McCauley* was arbitrary and capricious. *Id.*

*McCauley* is readily distinguishable from the instant case. Though the Plan Administrator in the present case is an "arm of the employer," the potential conflict does not appear to have affected the decision to exclude the ADD COMP payments from Shapiro's benefits. The Plan Administrator did not ignore or mischaracterize evidence provided by Shapiro.

As was the case in *McCauley,* to the extent that there is any dispute about the characterization of the payments, it is a dispute about the interpretation of the word "bonus" under the terms of the Plan. This is a matter peculiarly within her province.

The Plan Administrator appears to have taken Shapiro's arguments into account. She gave detailed reasons for excluding the ADD COMP payments in her pensionable income. The reasons provided by the Plan Administrator indicate that the decision was based in part on NYU's con-

sistent interpretation of the Plan; this interpretation was not unique to Shapiro's situation and did not represent a new interpretation of the Plan's terms.

Furthermore, unlike in *McCauley*, there is no evidence before me demonstrating that defendants in this case have been repeatedly accused of biases in the administration of benefits.

The Court, having weighed the potential conflict, concludes that it does not appear to have influenced the Plan Administrator's decision to interpret "bonus" to exclude the ADD COMP payments. It does not, therefore, does not compel a conclusion that the Plan Administrator acted in an arbitrary and capricious manner.

## IV. Attorney's Fees

ERISA provides that: "In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).

 In the Second Circuit, courts have applied "the *Chambless* factors," a five-factor test, in deciding whether to award attorneys' fees. The factors include: 1) degree of the offending party's culpability or bad faith; 2) the ability of the offending party to satisfy an award of attorney's fees; 3) whether an award of fees would deter other persons from acting similarly under like circumstances; 4) the relative merits of the parties' positions; and 5) whether the action conferred a common benefit on a group of pension plan participants. *Chapman v. ChoiceCare Long Island Long Term Disability Plan,* No. 07–2518–cv, 2009 WL 39892, at *1 (2d

Cir. Jan. 8, 2009), *quoting Chambless v. Masters, Mates & Pilots Pension Plan,* 815 F.2d 869, 871 (2d Cir.1987). Failure to prevail on one *Chambless* factor is not dispositive, *Chapman,* 2009 WL 39892 at *1, and ERISA's attorney's fee provisions must be liberally construed *Chambless,* 815 F.2d at 872.

 Shapiro has asked for attorney's fees; NYU (which is the prevailing party) has not. The Court does not find that either party to this suit acted in bad faith. Shapiro brings this action for her own benefit. NYU was without question careless in not catching the Medical School's error and so giving Shapiro bad information about her anticipated pension benefits, and Shapiro had no reason to question the "estimates" prepared by HSRP. However, it would not be appropriate to award Shapiro her attorney's fees to punish NYU for its error.[2]

## V. Conclusion

Defendants' motion for summary judgment is granted; Plaintiff's cross-motion is denied. The Clerk of the Court is directed to enter judgment for Defendants and to close the file.

This constitutes the decision and order of the Court.

---

2. The dispute between Shapiro and NYU over why NYU did not commence paying Shapiro the undisputed portion of her pension benefits—much documented and discussed by the parties—really does not have anything to do with the merits of this action. Both sides have meritorious arguments; NYU's stance is not a sign of "bad faith."