**Adam GINGOLD, Plaintiff,**

v.

**BON SECOURS CHARITY HEALTH SYSTEM, Defendant.**

**No. 08 Civ. 2364 (VM).**

United States District Court, S.D. New York.

March 1, 2011.

Michael Howard Sussman, Sussman & Watkins, Goshen, NY, for Plaintiff.

Carol Casteel Poles, The Law Firm of Steinberg & Symer, LLP, Poughkeepsie, NY, Darren Creasy, Sidney Steinberg, Post & Schell, P.C., Philadelphia, PA, for Defendant.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff Adam Gingold ("Gingold") brought this action against defendant Bon Secours Charity Health System ("Bon Secours") alleging that Bon Secours failed to reasonably accommodate his disability and created conditions amounting to constructive discharge, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a) and the New York Human Rights Law ("NYHRL"), New York Executive Law § 296. Bon Secours now

moves for summary judgment (the "Motion") pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56") on Gingold's claims, as well as on the issue of damages, which Bon Secours contends Gingold failed to mitigate.

For the reasons discussed below, the Court GRANTS Bon Secours's Motion in part and DENIES the remainder as moot.

### I. BACKGROUND [1]

From July 1997 until August 17, 2007, Gingold was employed by Bon Secours as a "PC Technician," providing support for various information technology issues. He started out working at Bon Secours's Good Samaritan Hospital, located in Suffern, New York, and transferred shortly thereafter to Bon Secours Community Hospital ("Community Hospital") in Port Jervis, New York. For the duration of his employment with Bon Secours, Gingold's immediate supervisor was Donald DeGraw ("DeGraw"), Manager of Desktop Support. DeGraw reported to David Kurilla ("Kurilla"), Executive Director of Technical Services, and Kurilla reported to Maureen Price ("Price"), Vice President of Information Services for the entire Bon Secours system.

In 2003, Gingold was diagnosed with an anxiety and panic disorder. As a result of this condition, he suffered from panic attacks which were apparently triggered by traveling out of his local area. According to medical records, Gingold first reported the symptoms to his doctor in August 2003. Several months later, in early Octo-

---

1. The factual summary below is derived from the following documents and any exhibits and declarations attached thereto: Defendants' Statement of Undisputed Material Facts, dated February 26, 2010 ("Bon Secours's Rule 56.1 Statement"); Plaintiff's Rule 56.1 Reply and Counter–Statement, dated February 5, 2010 ("Gingold's Rule 56.1 Statement"); and the Affirmation of Christopher Watkins, dated February 8, 2010 and submitted in support of Gingold's opposition to the Motion. The Court will make no further reference to these sources unless otherwise specified.

ber of that year, Gingold provided a doctor's letter to Bon Secours, which stated:

> Please be advised that Adam Gingold is under my care for anxiety/panic attacks. This diagnosis manifests when he travels further than sixty-five (65) miles from his home resulting in an accelerated heart beat and palpitations which leads to him loosing [sic] feeling in his arms and legs.
>
> Currently, he is on medication treatment [sic] which has not proved to be successful at this time.

(Bon Secours's Rule 56.1 Statement, Ex. D.) Although Bon Secours's entire technical staff had been invited to attend a software training program in Paramus, New Jersey later that month, Gingold did not attend, and it is undisputed that no negative employment consequences followed. There is some evidence in the record suggesting that Gingold continued to advise his supervisors of his medical condition, at least in a general manner, on several occasions over the next few years.

On June 27, 2007, Bon Secours's Information Services Department held a conference call to discuss various issues. During the call, DeGraw informed Bon Secours's technical support staff, including Gingold, that Bon Secours would be instituting a new rotation system (the "Rotation System") whereby technicians at Community Hospital would be on call to provide weekend technical support coverage for several other facilities within the Bon Secours system. Price elaborated that, under the Rotation System, travel to the other facility sites would be required. Gingold later testified at deposition that management stated during the call that technicians who were unable to meet the requirements of the Rotation System could "start looking for another job." (Bon Secours's Rule 56.1 Statement, Ex. A at 277:14–278:5.) While Gingold admits that management was

vague about the precise details of the Rotation System because the program had yet to be finalized, the technical staff was informed that management expected that the Rotation System would commence in or about September 2007. The staff were also told that they would be given four weeks' notice prior to the start of the Rotation System, and that additional calls would be held as the details crystallized.

At some point after the June 27 call, Gingold approached DeGraw to express concern regarding his panic attack condition and the travel requirements to be imposed under the new Rotation System. DeGraw replied that he had not been aware of Gingold's condition or that Gingold had previously submitted any doctor's notes, but DeGraw said he would discuss the situation with Kurilla and Price. Next, Gingold initiated a conversation with Kurilla, during which he informed Kurilla of his medical condition and stated that he was concerned about being required to travel to other Bon Secours facilities. Kurilla responded that he would have a better idea about the possibility of accommodating Gingold once the Rotation System was closer to being finalized. Finally, Gingold went to Price, who told him that there would definitely be a Rotation System of some sort, but that the final details had not yet been presented to Bon Secours's senior management.

On July 9, 2007, at DeGraw's request, Gingold faxed DeGraw a copy of a doctor's note dated January 4, 2006 stating that Gingold suffered from a panic disorder triggered by driving "out of the local area." (Bon Secours's Rule 56.1 Statement, Ex. F.) DeGraw responded by email asking Gingold to clarify the precise limitations on his ability to travel. Gingold testified that he spoke to DeGraw the next day and expressed concern about traveling to attend a computer training session

scheduled for July 12 at a Bon Secours facility in Warwick, New York, forty-five miles from Gingold's home in Glen Spey, New York. After speaking again with Kurilla, who suggested that Gingold might attempt the drive to Warwick on July 12 in order to test how manageable the travel would be, Gingold ultimately agreed to attend the training. He later reported to his supervisors that he had experienced panic attack symptoms upon arrival at Warwick, but that those symptoms dissipated after he rested for several minutes.

Two days after the Warwick training, on July 14, 2007, Kurilla presented Gingold with a written disciplinary notice based on an unrelated incident that allegedly occurred several weeks prior, in early June 2007. Gingold testified at deposition that Kurilla also told Gingold that if Gingold was unable to travel to Warwick for rotations because of his medical condition, he would be out of a job by the second week of September. Gingold testified that, after this conversation with Kurilla, he called Price on the phone to discuss possibilities for accommodating his condition, and he proposed being granted additional opportunities to adjust to making the trip to Warwick before the Rotation System was to go into effect. According to Gingold, Price responded that there was no way to accommodate his condition and that all employees would have to meet the requirements of the Rotation System.

At some point between July 14 and July 19, 2007, Gingold met with a local Bon Secours human resources employee who informed him that Bon Secours had made accommodations in the past for situations like Gingold's, and advised Gingold to speak with Bon Secours's human resources director, Sheila Buthe ("Buthe"). On or about July 19, Gingold spoke with Buthe to discuss whether Bon Secours could accommodate his medical condition with regard to the proposed Rotation System.[2] Buthe told Gingold that she would discuss the issue with Price and asked him to provide her with documentation of his medical condition.[3]

The next day, July 20, 2007, having learned that he would be offered employment at another company, Granite Associates ("Granite"), where he had interviewed the week before, Gingold submitted a letter to Kurilla resigning from Bon Secours effective August 17, 2007. Gingold did not explain the reasons for his resignation in that letter. On July 23, Buthe emailed Gingold, acknowledging receipt of Gingold's resignation letter and stating, "in light of your resignation, I will not be pursuing your inquiry to me regarding the rotation schedule." (Bon Secours's Rule 56.1 Statement, Ex. N.) Nine days later, Gingold responded to Buthe, arguing for the first time that his resignation had been forced by Kurilla's July 14 comment that Gingold should start looking for a new job.

There were no further communications on the subject for the next two weeks, and Gingold continued to work at Bon Secours in advance of his August 17, 2007 end date. Then, on August 14, Buthe and Gingold spoke over the telephone. The parties dispute what transpired during this call. Gingold later testified at deposition that he told Buthe that he wanted to remain in his position at Bon Secours if he could be accommodated regarding the Rotation

---

**2.** Gingold testified that he had previously sent Buthe an email asking to discuss possible accommodations. However, there is no record of that correspondence in the materials submitted by either party.

**3.** Gingold sent Buthe a copy of a doctor's note that appears to be identical to the January 4, 2006 note Gingold had previously faxed to DeGraw, except that the date was changed in a conspicuous manner to read July 13, 2007.

System. By contrast, in an email Buthe sent to Gingold on August 15, which appears to have been intended to confirm the previous day's call, Buthe wrote that both Kurilla and DeGraw disputed that Kurilla forced Gingold to resign or told him to start looking for another job. Buthe continued,

> while I was prepared to discuss the issues surrounding your possible need for an accommodation, you indicated to me in our conversation yesterday that you are not interested in remaining at Community [Hospital] and have, in fact, already found other employment. In light of your decision, it does not appear that we can address that issue further.

(*Id.*, Ex. P.) Gingold responded to Buthe by email almost immediately, writing,

> I never mentioned yesterday that I was not interested in staying at Community [Hospital]. I had contacted [Kurilla and DeGraw] for a reasonable accommodation. That is the reason that I had contacted you a few weeks ago. In light of the responses from you, [Kurilla and DeGraw], I can see there was no intention to make any accommodations. My medical condition has been recognized in the past with accommodations but I see this is not the case. Thank you for your time.

(*Id.*, Ex. Q.).[4]

Gingold ended work at Bon Secours on August 17, 2007, and began at Granite three days later.[5]

As a postscript to this story, Bon Secours did not implement its Rotation Sys-

tem until December 2007, approximately six months after it was first proposed and four months after Gingold departed. The program rules specifically provide that technicians are permitted to exchange coverage shifts and that "alternative coverage arrangements" are acceptable if approved. (*Id.*, Ex. R.)

## II. *LEGAL STANDARD*

### A. *SUMMARY JUDGMENT STANDARD*

Under Rule 56, a court may grant summary judgment if, on the record before it, there exists "no genuine issue as to any material fact" and the moving party is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *Alabama v. North Carolina*, —— U.S. ——, 130 S.Ct. 2295, 2308, 176 L.Ed.2d 1070 (2010). In determining whether disputed issues of material fact exist, a court must view the evidence in the light most favorable the non-moving party, and draw all reasonable inferences in its favor. *See, e.g., Shapiro v. New York Univ.*, 640 F.Supp.2d 411, 418 (S.D.N.Y.2009) (*citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## III. *DISCUSSION*

### A. *REASONABLE ACCOMMODATION*

#### 1. *Legal Standard*

 Section 102(a) of the ADA creates a private right of action for disability-

---

**4.** For the purposes of this Motion, Bon Secours accepts Gingold's version of the August 14, 2007 telephone call.

**5.** Unfortunately, Gingold had apparently not informed Granite about his travel limitations prior to accepting the position there, and the employment agreement that Gingold signed specifically provided that occasional travel would be required. Upon learning of Gin-

gold's inability to travel, Granite withdrew its employment offer, and terminated Gingold on August 22, 2007. There is no record of Gingold having obtained employment again until April 2008, when he was hired by the Law Offices of M.L. Zager, P.C. ("Zager"). However, Gingold's position at Zager was terminated in July 2008 for reasons that are disputed by the parties.

based employment discrimination. *See* 42 U.S.C. § 12112. A plaintiff suing under the ADA for disability discrimination bears the burden of establishing a prima facie case. *See Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 183–84 (2d Cir.2006). "In so-called reasonable-accommodation cases," such as the one at hand, a plaintiff must show that "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Id.* at 184.[6]

■■■ "[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Id.* (*quoting* 29 C.F.R. pt. 1630, app. at 363 (2003)); *see also Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C.Cir. 1999) ("An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation."). Once the plaintiff establishes that he has requested an accommodation, however, a duty is triggered on the part of the employer "to investigate that request and determine its feasibility." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d Cir.2000); *see also Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 568 n. 4 (2d Cir.2000) (recognizing that an employer is obligated to "take affirmative steps to assist an employee in identifying potential accommodations."). These responsibilities conform to the "interactive process" envisioned by the ADA, in which "employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan*, 205 F.3d at 566. In evaluating a claim for failure to accommodate, therefore, "courts should attempt to isolate the cause of the breakdown [of the interactive process] and then assign responsibility." *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135–36 (7th Cir.1996) ("[C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.").

### 2. *Analysis*

Bon Secours argues that, by submitting his notice of resignation on July 20, 2007, one day after his conversation with Buthe and without having waited for a response, Gingold unilaterally terminated the "interactive process" and thereby released Bon Secours from any further obligation to consider possible accommodations.[7] In contrast, Gingold responds that Bon Secours failed to engage in an interactive process and refused to provide—or even discuss with Gingold—any reasonable accommodation. Specifically, Gingold contends that Kurilla's and Prices's separate indications to him that Bon Secours would not consider accommodations were suffi-

---

**6.** "A claim of disability under the [NYHRL] is governed by the same legal standards as govern federal ADA claims." *Graves*, 457 F.3d at 184 n. 3. Thus, Gingold's state law disability claim "survives or fails on the same basis" as his ADA claim. *Id.*

**7.** Bon Secours concedes that Gingold is disabled under the ADA for the purposes of this motion, and disputes the second, third and fourth prongs of the reasonable accommoda-

tion test under *Graves*. As the Court finds that the analysis turns on the fourth *Graves* factor, *i.e.*, whether Bon Secours refused to make an accommodation, it does not reach the questions of whether Bon Secours had notice of Gingold's disability or whether, with a reasonable accommodation, Gingold could have performed the essential functions of his position.

cient to allow Gingold to presume that he would not be accommodated. Gingold also argues that his telephone conversation with Buthe on August 14, during which he allegedly indicated his desire to remain at Bon Secours if an accommodation could be reached, provided Bon Secours with an opportunity to retract its prior refusals to accommodate, which Bon Secours failed to accept.

■ Viewing all the evidence in a light most favorable to Gingold, the Court finds that it was Gingold, not Bon Secours, who unilaterally and prematurely terminated the reasonable accommodation process. Indeed, even if the Court accepts Gingold's testimony that (1) Kurilla stated that Gingold would be out of a job in September 2007 if he were unable to travel to rotation sites, and (2) that Price stated unequivocally that there was no way for Bon Secours to accommodate Gingold's disability, the Court is not persuaded that a question of material fact exists as to the cause of the breakdown of the discussions. Gingold admits that, even after allegedly receiving the negative messages referred to above from Kurilla and Price, he continued to seek an accommodation from Buthe, Bon Secours's Director of Human Resources. And, although Buthe told Gingold that she would investigate the situation and get back to him, Gingold tendered his resignation before she could do so. Under these circumstances, no reasonable jury could find that it was Bon Secours, rather than Gingold himself, who terminated the interactive process for discussing accommodations. See *Nugent v. St. Lukes–Roosevelt Hosp. Center,* 303 Fed.Appx. 943, 946 (2d Cir.2008) ("An employee who is responsible for a breakdown of [the] interactive process may not recover for a failure to accommodate.").

In this regard, the Fifth Circuit's decision in *Loulseged v. Akzo Nobel Inc.,* 178 F.3d 731 (5th Cir.1999) proves instructive. There, a laboratory technician whose duties involved transporting heavy containers of chemicals learned that her employer, which had previously hired contractors to assist all of its laboratory technicians with their transport duties, would be eliminating its use of contractors for that function in the near future. The plaintiff, who was unable to perform heavy lifting due to a disability, asked her supervisor whether the new policy would apply to her as well, and he responded that it would. The plaintiff resigned shortly thereafter, one week before the new policy took effect, and without taking any additional steps to discuss accommodations with her superiors. In affirming the District Court's grant of summary judgment in favor of the employer, the Fifth Circuit found significant the fact that the new policy had not yet been implemented. *See id.* at 735, 737 ("Under the circumstances of this case, where the employee would not have been faced with the problematic job duties immediately, [the employer] was under no obligation to make a formal presentation [of possible accommodations] to [the plaintiff]."). While the Court noted that, "[a] clear declaration by an employer that no reasonable accommodation will be forthcoming might indeed be seen as terminating the interactive process and removing any duty the employee had to speak up," *id.* at 738, it held that, given the facts at hand, the plaintiff

> was not presented with any statement that could be reasonably interpreted as clearly foreclosing further discussion and announcing the company expected her to perform without a reasonable accommodation. She was never asked to perform under such conditions, and [she] made no effort to determine what conditions she could have expected to encounter when her rotation came due.

*Id.* at 740.

The Court is not persuaded by Gingold's efforts to distinguish the facts here from

those in *Loulseged.* While Gingold did initiate a conversation with Bon Secours regarding an accommodation, and Kurilla and Price may have indicated to Gingold that no accommodations would be considered, even Gingold appeared to believe that those statements were not definitive, since he continued to pursue an accommodation with Buthe. Indeed, the facts here present material similarities to *Loulseged* in that (1) the travel duties that would have been problematic for Gingold were not imminent, and (2) Gingold chose to resign and accept the position at Granite, rather than wait for Buthe to respond to his inquiry.

Gingold also argues that Bon Secours erred when it refused to allow him to rescind his resignation prior to the last day of his employment. However, Gingold's indication to Buthe on August 14 that he wished to remain at Bon Secours if his travel limitations could be accommodated did not automatically restart Bon Secours's obligation to engage in good faith discussions regarding an accommodation. To hold otherwise would be tantamount to requiring Bon Secours to permit Gingold to rescind his resignation regardless of whether Bon Secours was inclined to do so. *See Rush v. Verizon Va., Inc.*, No. 7:04 Civ. 0093, 2004 WL 2900654, at *3 (W.D.Va. Dec. 9, 2004) (holding that employer ceased to owe employee any duty under the ADA upon the employee's resignation) (*citing Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1256 n. 5 (4th Cir.1985)); *EEOC v. United Air Lines, Inc.*, No. 98 Civ. 7829, 2000 WL 1738346, at *12 (N.D.Ill. Nov. 21, 2000) (holding that employer's refusal to permit employee to rescind resignation does not violate the ADA). Although the decisions cited above involved employees who sought to be rehired following resignations submitted with immediate effect, the fact that

Gingold's August 14 conversation with Buthe occurred prior to the effective date of Gingold's resignation does not change the analysis. An employer is entitled to rely on an employee's statement that the employee intends to terminate his employment, regardless of whether the resignation includes a customary—and often expected—term of advance notice.

Consequently, Bon Secours's Motion is granted with respect to Gingold's reasonable accommodation claim.

## B. *CONSTRUCTIVE DISCHARGE*

### 1. *Legal Standard*

 "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003). The standard is a "demanding one," because "a constructive discharge cannot be proven merely by evidence that an employee ... preferred not to continue working for that employer or that the employee's working conditions were difficult or unpleasant." *Miller v. Praxair, Inc.*, No. 09 Civ. 2962, 408 Fed.Appx. 408, 409, 2010 WL 4751782, at *1 (2d Cir. Nov. 24, 2010) (internal quotation marks omitted).

### 2. *Analysis*

 Bon Secours argues that Gingold was not constructively discharged because Gingold, not Bon Secours, was responsible for terminating the interactive process by resigning. Bon Secours also notes that Gingold knew he would be able to work for at least two more months before the Rotation System would take effect, and that the timing of Gingold's resignation was prompted by his job offer from Granite rather than by any deliberate action on the part of Bon Secours. Gingold counters

that a reasonable jury could find that Bon Secours terminated the interactive process, and that the combination of (1) Kurilla's and Prices's statements that Gingold would not be accommodated, (2) Gingold's receipt of a disciplinary notice two days following his trip to Warwick, and (3) Buthe's email of August 15, 2007, which allegedly misrepresented the content of the previous day's telephone conversation between Gingold and Buthe, could lead a reasonable jury to conclude that Gingold was forced out of his position by intolerable working conditions.

The Court disagrees. First, as discussed above, there can be no reasonable dispute that the responsibility for ending the interactive process lies with Gingold alone. Next, even if Kurilla's and Price's statements might be found to have evinced a degree of hostility towards Gingold, they could not, in light of Buthe's conversation with Gingold on July 19, be found to constitute "deliberate action" by Bon Secours creating conditions so intolerable as to cause Gingold's resignation. *See Whidbee v. Garzarelli Food Specialties., Inc.*, 223 F.3d 62, 74 (2d Cir.2000). Nor could the cumulative effect of the purportedly unrelated disciplinary notice Gingold received on July 14 provide a basis for Gingold's circumstances to be found more than simply unpleasant. *See Nugent v. St. Luke's/ Roosevelt Hosp. Center.*, No. 05 Civ. 5109, 2007 WL 1149979, at *14 (S.D.N.Y. Apr. 18, 2007) ("The fact that an employee feels that the quality of [his] work has been unfairly criticized ... is insufficient to support a constructive discharge claim."). Finally, even if a reasonable jury could conclude that Buthe's August 15 email response to Gingold constituted a failure in bad faith on the part of Bon Secours to continue discussions with Gingold concerning an accommodation, such a finding would be irrelevant. As discussed above, Bon Secours's obligations to Gingold un-der the ADA terminated upon Gingold's delivery of his resignation notice on July 20, 2007.

Therefore, as the Court finds no genuine issue of material fact with respect to Gingold's constructive discharge claim, Bon Secours's Motion on that claim is granted.

## C. *DAMAGES*

Given the Court's determination that Bon Secours is entitled to judgment as a matter of law with respect to both of Gingold's claims, Bon Secours's motion for summary judgment as to Gingold's failure to mitigate his post-resignation damages is denied as moot.

## IV. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion ("Motion") for summary judgment (Docket No. 17) of defendant Bon Secours Charity Health System ("Bon Secours") is GRANTED as to the claims of plaintiff Adam Gingold ("Gingold") asserting (1) failure to reasonably accommodate his disability and (2) constructive discharge; and it is further

**ORDERED** that Bon Secours's Motion as to Gingold's failure to mitigate damages is DENIED as moot.

The Clerk of Court is directed to terminate any pending motions and to close this case.

**SO ORDERED.**